**BROS INCORPORATED, Appellant,**

v.

**W. E. GRACE MANUFACTURING COM-
PANY and William E. Grace,
Appellees.**

**W. E. GRACE MANUFACTURING COM-
PANY and William E. Grace,
Appellants,**

v.

**BROS INCORPORATED, Appellee.**

**No. 21470.**

United States Court of Appeals
Fifth Circuit.

Sept. 14, 1965.

Rehearing Denied Oct. 20, 1965.

Andrew E. Carlsen, Minneapolis, Minn., Joseph H. Schley, Dallas, Tex., Douglas L. Carlsen, Minneapolis, Minn., for plaintiff-appellant, Schley & Schley, Dallas, Tex., of counsel.

Channing L. Richards, Charlotte, N. C., for appellees-appellants, Horace B. Houston, Jr., Dallas, Tex., of counsel.

Before TUTTLE, Chief Judge, and BROWN and GEWIN, Circuit Judges.

JOHN R. BROWN, Circuit Judge:

Now rounding out its first decade in this Court, this case, coming to us for the fourth time with two intervening trips to the 6th Circuit and one to the 8th[1] is a tribute to "the ant-like persistence of [patent] solicitors," Lyon v. Boh, S.D. N.Y., 1924, 1 F.2d 48, 50, and their court-

---

1. This is the run-down from 6th to 5th to 8th and back again:

[1]  D.C.Ohio, 1957:  William Bros Boiler & Mfg. Co. v. Gibson-Stewart Co., Inc., 116 USPQ 138

[2]  D.C.Tex., 1958:  Bros Inc. v. W. E. Grace Mfg. Co., 158 F.Supp. 786

[3]  5 Cir., 1958:  Bros Inc. v. W. E. Grace Mfg. Co., 261 F.2d 428

[4]  6 Cir., 1959:  Gibson-Stewart Co., Inc. v. William Bros Boiler & Mfg. Co., 264 F.2d 776, cert. denied, 360 U.S. 929, 79 S.Ct. 1448, 3 L.Ed.2d 1544

[5]  D.C.Ohio, 1961:  William Bros Boiler & Mfg. Co. v. Gibson-Stewart Co., Inc., 202 F.Supp. 6

[6]  D.C.Minn., 1962:  Browning Mfg. Co. et al v. Bros Inc., 134 USPQ 231

[7]  6 Cir., 1963:  William Bros Boiler & Mfg. Co. v. Gibson-Stewart Co., Inc., 312 F.2d 385

[8]  8 Cir., 1963:  Bros Inc. v. Browning Mfg. Co., 317 F.2d 413, cert. denied, 375 U.S. 825, 84 S.Ct. 67, 11 L.Ed.2d 58

[9]  5 Cir., 1963:  Bros Inc. v. W. E. Grace Mfg. Co., et al., 320 F.2d 594

[10]  5 Cir., 1964:  Bros Inc. v. Davidson, 330 F.2d 65

To facilitate discussion, reference will be made to these decisions and page citations as follows: e. g., (Op. [3] 429) indicates 261 F.2d 428 at 429.

Having now occupied the attention of not less than 25 Judges in the Fifth, Sixth, and Eighth Circuits, this case brings sharply to mind the Chief Justice's May 1965 address to the American Law Institute imploring the bench, the bar, and the public, to exert resourceful ingenuity in finding ways to maintain the quality of our celebrated system of justice without squandering precious and limited judge-time, on the one hand, or numerically expanding the structure to the point where it breaks down of its own weight as the nation explodes toward the 300–400 million mark. Perhaps the President's Commission On The Patent System under the chairmanship of Chancellor Ransom will think this problem worthy of its attention (Ex. Order No. 11215, 30 F.Reg. 4661 (1965)).

room advocate counterparts as so much grist is made out of one patent.[2]

Hopefully, this visit will achieve an end to this case, in this Court at least, although we fear that our decision is a prologue to another act since on a vital point of substantive patent law, we find ourselves in disagreement [3] with our distinguished Brothers of the Eighth Circuit.[4]

■ The stage for this scene may be quickly set. In our 1963 decision (Op. [9]) we modified and affirmed infringement damages but remanded the case for determination of F.R.Civ.P. 60(b) relief based on an asserted § 102(b) prior publication of the Road Show pamphlet-brochure allegedly describing the patented earth compactor. The District Court on the remand found 60(b) relief warranted thereby releasing Fifth Circuit Courts from the binding res judicata effect of the Ohio judgments (Op. [1], [4], [5] and [7]). On the merits, it held, as did the 8th Circuit (Op. [8] and [6]) that the publication disclosed the invention to invoke the absolute bar of § 102(b), 35 U.S.C.A. § 102(b). We uphold the Trial Judge as to 60(b) but reverse as to § 102(b) thereby reinstating the judgment upholding validity, infringment and the award of damages.

## The 60(b) Relief

■ We sent the case back to determine whether the celebrated brochure (described in Op. [8] 415) was in fact published at or before the July 1948 Chicago Road Show and, if so, whether circumstances of earlier non-disclosure or concealment of such fact satisfied requisite equitable consideration warranting 60(b) relief. The Patentee was implicated directly in this since its manager, Williamson (also a co-patentee), in the June 23, 1959 affidavit opposing reopening of the case by the Sixth Circuit, swore (Par. 7) positively that such brochure "was not prepared or distributed by [Patentee] until long after said roadshow."

Where in the 8th Circuit appeal the finding of 1948 publication was not attacked (Op. [8] 415), the fact has now been irrefutably established as a fact. In the course of November 1963 pre-trial discovery for the 60(b) hearing then fixed for December 16, 1963, there was extensive inquiry both as to what had been discovered as to *when* the brochure had been published and, also, the nature and scope of the search. The evidence detailed the unsuccessful efforts conducted on a dual front under the direction of Williamson and the comptroller in 1959 in preparation of the Minnesota

2. No. 2,610557, application filed November 17, 1949, issued September 16, 1952, for *pneumatic roller compactor.*

3. If an outright inter-Circuit conflict precipitates certiorari, the whole thing may be revived if the Supreme Court were to exercise *its extraordinary powers to* reach back to rectify past mistakes. Cf. United States v. Ohio Power Co., 1957, 353 U.S. 98, 77 S.Ct. 652, 1 L.Ed.2d 683; Cahill v. New York, New Haven & Hartford R. Co., 351 U.S. 183, 76 S.Ct. 758, 100 L.Ed. 1075.

4. This is apparently an inescapable consequence of our case or controversy approach, and the hierarchial independence of each of the Circuits. The Eighth Circuit recognizes that it must decide for itself. Aeration Processes, Inc. v. Lange, 8 Cir., 1952, 196 F.2d 981, 982, cert. denied, 1952, 344 U.S. 834, 73 S.Ct. 43, 97

L.Ed. 649. And doing so it has just recently differed with us. Graham v. John Deer Co.; John Deer Co. v. Graham, 8 Cir., 1964, 333 F.2d 529, cert. granted, 1965, 379 U.S. 956, 85 S.Ct. 652, 13 L.Ed.2d 553, hold invalid the Graham patent held valid by us in Jeoffroy Mfg. Inc. v. Graham, 5 Cir., 1955, 219 F.2d 511, cert. denied, 1955, 350 U.S. 826, 76 S Ct. 55, 100 L.Ed. 738; Graham v. Cockshutt Farm Equipment Co., Inc., 5 Cir., 1958, 256 F.2d 358. Hopefully all will soon know whether that patent is or is not valid when the Supreme Court articulates the standards, as it is bound to do in deciding the above case and Calmar, Inc. v. Cook Chemical Co., 8 Cir., 1964, 336 F.2d 110, cert. granted, 1965, 380 U.S. 949, 85 S.Ct. 1082, 13 L.Ed.2d 967; and Adams v. United States, Ct. Claims, 1964, 330 F.2d 622, cert. granted, 1965, 380 U.S. 949, 85 S.Ct. 1090, 13 L.Ed.2d 968.

trial (Op. [6]) where the § 102(b) issue was timely and directly raised for the first time. The upshot of that investigation was that no record, accounting or otherwise, could then be located showing the time of printing or even the identity of the printer. With our 1963 remand (Op. [9] 601–602, 605, 609–611) again focusing attention on it, the top owner-management of Patentee, naturally alarmed at the increasing use of opprobrious descriptives charging conscious misconduct, renewed the efforts with vigor through the new comptroller, Moberg, who had since replaced his less competent predecessor. He uncovered in a loft two bundles of old discarded bookkeeping cash disbursement journals, one of 212 pages, the other of 552. Study of these revealed 36 references to printers or advertising agencies, including an item of $178.30 with the Gile Letter Service which was verified through checking of the Invoice Register. Although Patentee had done no business with Giles since 1952, Moberg, going to Giles' office, located a Kardex accounts receivable card which showed an entry "50 ton compactor" for the invoice payment of $178.30. It was now certain that the brochure had indeed been printed and distributed not later than July 1948. Patentee's counsel immediately notified Infringer's counsel of the fact which at every stage thereafter it formally and unequivocally acknowledged.

Out of the Patentee's records, the Williamson June 23, 1959 affidavit was therefore proved to be incorrect. It was untrue. But was it something more? Deliberate? Knowingly false? Although this record details other circumstances which raise questions why the fact was not earlier uncovered, we think the record as a whole, F.R.Civ.P. 52(a), does not warrant the Trial Judge characterizing this affidavit as a "false statement" and "manifestly untrue and knowingly [so] made." It may have been given too hastily as a response to the efforts to reopen the 6th Circuit decision (Op. [4]) and perhaps too much reliance was put on the earlier escape clause in Par. 3 of the affidavit that "the following information * * * is true to the best of my knowledge and belief." But we do not think it shows a deliberate evil purpose to misstate or conceal or thereafter engage in foot-dragging lest the truth might be uncovered.

But this does not alter granting 60(b) relief. Because of the unique factors of this case and this type of public interest litigation which we previously discussed at length (Op. [9] 609–611) 60(b) relief was justified, if not compelled. Stated with such positiveness, the affidavit, accompanied by strong memorandum briefs (see Op. [9] 603–605) undoubtedly had a decisive impact on the 6th Circuit. The 6th Circuit's reliance on its literal truth closed the door there, and by res judicata here. The effect was the same whether there was evil, innocent or careless, purpose. In either event it was the action of the party taken while the case was still "alive" and when had the truth now revealed been disclosed quite a different result might have come about.

Expunging now the aspersions of purposeful misconduct, we are nonetheless certain that the broad reach of 60(b) reaches this far. The Judge was correct, therefore, in granting 60(b) relief to introduce belatedly, but permissibly, the new defense of § 102(b) prior publication.

## § 102(b) Prior Publication

In the Eighth Circuit case, Judge Nordbye held that the brochure sufficiently disclosed the invention (Op. [6]) and applied the bar of § 102(b).[5] The Eighth Circuit affirmed largely on the ground, as we read its opinion, that this was a question of fact (Op. [8] 416) as generally identity is. See Bischoff v. Wethered, 1869, 19 Wall. 812, 814, 76

---

5. 35 U.S.C.A. § 102: "A person shall be entitled to a patent unless—* * * (b) the invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States * * *."

U.S. 812, 814, 19 L.Ed. 829; Southern Implement Mfg. Co., Inc. and George Partin v. McLemore, 5 Cir., 1965, 350 F.2d 244. While highly persuasive on principles of stare decisis, the Eighth Circuit's decision does not eliminate our judicial travail since we have the duty of reaching our own independent decision on the merits of the case as between these parties and on this record, Pierce v. Aeronautical Communications Equipment, Inc., 5 Cir., 1962, 307 F.2d 790, even though as it did there, this brings about diametrically opposed decisions on validity of the same patent against the same attack. And the Patentee urges, successfully it turns out, that there is a critical difference in this record in the form of expert opinion testimony with accompanying charts demonstrating element by element the deficiency in the brochure disclosure of the claimed invention.

One of the reasons there have been, and will be, differences is the inherent difficulty in the decisional process brought about largely by the unavoidable wordiness of controlling legal principles. In the final analysis, the rules support the result, seldom point the way to decision.

At this late date it is an affectation to pick out the threads which now make up this fabric by citation of case by case. If there is any disagreement in the statement of principles—not their application—we cannot discern it. Consequently, for our purposes we think it best to draw on the well recognized treatise [6] for the synthesis of this accumulated wisdom.

■ One notices a principal, recurring theme with the differences being in verbal shadings, new figuratives. "A prior printed publication to defeat a patent must describe the invention in such full, clear and exact terms as to enable any person skilled in the art to which it relates to practice the invention." (277) "It must be in such full, clear and exact terms as to enable one skilled in the art

to practice the patented improvement without the exercise of inventive skill of his own and without assistance from the patent claimed to have been anticipated." (278) In another phrasing to meet the test, the "prior description must disclose clearly, truly, and fully what the subsequent patentee invented and accomplished." (278) Another puts it, "Such description must exhibit a substantial representation of the patented invention." (277) In the words of the celebrated case,[7] the revelation must be "in such full, clear and exact terms as to enable any person skilled in the art or science * * * to make, construct, and practice the invention to the same practical extent as they would be enabled if the information was derived from a prior patent." (286)

■■ Of course, the ordinary skill in the art is not ignored. It is very much a part of the test. Nevertheless we must "read" the publication as we would a prior patent since the "same rules as to the sufficiency of the description in a patent apply to a printed publication in order to constitute it an anticipation." (280) The result is that "Essential elements cannot be read into the description, nor can information which it does not give." (277) But if the essential elements are revealed, the "fact that the prior art description did not use the exact words employed in the claims of the patent in suit" is "not determinative" since "the real question" is "whether the substance of the description was the same." (290)

These principles, the function of § 102(b) and its predecessors, the development of the case law both in Court and the Patent Office are exhaustively analyzed by Judge Arthur M. Smith's opinion for the Court in Application of LeGrice, 1962, 301 F.2d 929, 49 CCPA 1124. He uses an acquisitive figure, the test being whether the ubiquitous skilled artisan using his own talents "could take"

6. The quotations are from 1 Deller's Walker on Patents §§ 60, 61, 78, 79, 80 (1964). Page references are indicated, e.g. (277).

7. Seymour v. Osborne, 1870, 11 Wall. 516, 78 U.S. 516, 20 L.Ed. 33.

the "teachings" of the prior publication "and be in possession of the invention." 301 F.2d 929, 936.

The problem ends as it began: does the brochure reveal "in such full, clear and exact terms as to enable any person skilled in the art * * * to make, construct and practice *the invention* to the same practical extent as * * * if the information was derived from a prior patent"?[8]

What is the invention?—not merely as to the device, but what is it the law regards as the "invention"? Here perhaps we get some help. For while the specification of the patent is indeed important, it must conclude with a claim[9] and we, and all other courts, have often held that it is the claim of a patent that measures the invention[10] so much so that each is (and must be) separable and distinct, each defining in effect a separate invention and each treated in law as a separate grant.[11] This means every element of each patent claim is deemed to be material to the inventive concept[12] and, of course, the Patent Office history is relevant if questions arise as to scope or interpretation of claims.[13]

In this process of matching the brochure against the claims, several things bear explaining. First, by res judicata from the Ohio judgment (Op. [1] and [4]), the patent is conclusively deemed to be valid so far as invention, novelty, and obviousness are concerned.[14]

Second, it is conceded on this record, as in the Eighth Circuit record (Op. [8]), that the display of the compactor at the Chicago July 1948 Road Show did not constitute prior public use or sale under § 102(b). Consequently, the comparison is against the publication only, unaided as it otherwise would have been—perhaps sufficently so—had the theoretical inventor made the theoretical inspection of a machine he theoretically knew about. Third, the inquiry must be one of substance, not mere technical expression, since the statutory bar is hardly to be confined to the sterile precision of claim jargon. The law contemplates, therefore, that when the prior publication is not in the form of a formal patent, it has been written, not in patentese,[15] but in ordinary language with here and there an occasional common or a period as a breathing spot.

Some slight addition to the rather detailed description of the brochure (Op. [8] 415–416) is helpful. The photographs did not reveal the interior of the body (box) or any of the structure within the arched transverse recess. The four supporting-compacting tires were well portrayed by side, oblique, and rear-end views. The latter showed the bottom third of the rear side of the four tires, the left pair tilted to conform to the sharply raised elevation of the ground on that side, the body (box) remaining horizontal.

8. Seymour v. Osborne, supra, note 7.

9. 35 U.S.C.A. § 112. "The specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention."
   This is reiterated in the Patent Office Rules of Practice, Rule 75(a).

10. Continental Paper Bag Co. v. Eastern Paper Bag Co., 210 U.S. 405, 28 S.Ct. 748, 52 L.Ed. 1122; Coulter v. Eagle & Phenix Mills, 5 Cir., 1929, 35 F.2d 268, 269, 270; United States Industries, Inc. v. Otis Engr. Corp., 5 Cir., 1958, 254 F.2d 198, 201.

11. Cameron Iron Works, Inc. v. Stekoll, 5 Cir., 1957, 242 F.2d 17; Hall v. Keller, 5 Cir., 1950, 180 F.2d 753, citing United

States ex rel. Steinmetz v. Allen, 1904, 192 U.S. 543, 24 S.Ct. 416, 48 L.Ed. 555.

12. United States Industries, Inc. v. Otis Engr. Co., 5 Cir., 1958, 254 F.2d 198.

13. Edward Valves, Inc. v. Cameron Iron Works, Inc., 5 Cir., 1961, 286 F.2d 933 at 943; Zachos v. Sherwin-Williams Co., 5 Cir., 1948, 164 F.2d 234; Inglett & Co. v. Everglades Fertilizer Co., 5 Cir., 1958, 255 F.2d 342.

14. The Eighth Circuit (Op. [8] 414 and [6]) is in agreement with the Sixth Circuit on this. We have many times pointed this out (Op. [9] 610, 598).

15. Thermo-King Corp. v. White's Trucking Service, Inc., 5 Cir., 1961, 292 F.2d 668, 675 n. 9.

The drawings on the reverse page were of side and birds'-eye views portraying generally the elevations shown in drawings Figs. 5 and 6 of the patent. The birds'-eye view showed apparently exterior frame (or side plate) members with only two transverse members, one at the front edge of the arch recess, the other at its rear edge. The wheel-tires were shown in position but no axle structure, either transverse, or fore-and-aft, was shown. The side view showed the plate forming the side with the arch recess. The draw means was a horizontal member running from the top front end of the body (box) to the tow-dolly. Midway between the front edge of the box and dolly, a member ran diagonally downward and joined a piece just forward of the front box plate. No extension of this member through the box was indicated. The arch showed space between the top edge of the wheel-tire, also a transverse plate-member, one at the forward, the other, the after, edge of the recess to which was affixed some character of mounting from which top and bottom horizontal lines ran to the tire edge indicating a fore-aft structure of some kind.

■ The testimony offered by the Infringer, through witnesses—some interested, some disinterested, all experienced presumably competent engineers, draftsmen, and practical equipment builders, and whose general credibility was for the Trial Judge, F.R.Civ.P. 52(a)—took the following general pattern which in our approach, we must, and do, credit fully for what it says. Upon being shown the brochure, each swore, in effect, that as one skilled in the art he "could build a compactor of the *type* it shows from the information the [brochure] contained"; [16] or if "asked to build a 50-ton compactor of this *sort* it illustrates and describes," he would "be able to do it"; [17] or he could "build an earth compactor of the *sort* it shows" or at least a "machine * * * comparable with it." [18] In more elaborate terms another said the brochure "describes, to a person skilled in the art, sufficient information to build a 50-ton compactor of the *type* that this [brochure] purports to *illustrate* and describe." [19]

But nearly all of them disclaimed ever having seen the patent. Consequently, they could express no opinion as to whether the "sort" or "type" of compactor "illustrated" or "described", they would build from the teachings of the brochure, was that revealed by the patent. More important, cross examination [20] demonstrated that a number of things discussed in the patent could nowhere be seen.

It is at this point that the testimony of the Patentee's engineer-lawyer-expert witness becomes so important. Its significance rests, not on credibility choices in the cruder sense, nor for that matter differences on what one skilled in the art would think of in the way of mechanical equivalents of distinctive elements in the claim. Rather, it rests on the analysis, element by element, carefully articulated and graphically portrayed,[21] demonstrating the limitations imposed during the Patent Office prose-

16. Witness Moore R. 20.

17. Witness Mims R. 31–32.

18. Witness Williams R. 39.

19. Witness Keppler, Chief Engineer of Tampo, a defendant in the yet untried infringement suit brought by Patentee in the Western District of Texas. (See Op. [9] 610, 603 n. 15). Similar testimony came also from Falke, employed by Browning, the successful 8th Circuit litigant (Op. [8] 414 and [9] 603 n. 15). [R. 192]

20. The Patentee's brief reminds us of what all advocates know, some from bitter experience: "[a] case that can be made out in all its elements by cross-examination of opposing witnesses is a strong case." Eibel Process Co. v. Minnesota & Ontario Paper Co., 1923, 261 U.S. 45, 53, 43 S.Ct. 322, 67 L.Ed. 523.

21. See especially PX–56A, PX–56B, PX–57, PX–58, PX–59, PX–60. In Bryan v. Garrett Oil Tools, Inc., 5 Cir., 1957, 245 F.2d 365, 374, we pointed up the value of these element-by-element aids to understanding; and see also Bryan v. Sid W. Richardson, Inc., 5 Cir., 1958, 254 F.2d 191, 192; and Thermo-King Corp. v. White's Trucking Service, Inc., 5 Cir., 1961, 292 F.2d 668.

cution and the presence or absence of those in the brochure. Focusing sharply as it did on these elements, it also exercises the real issue. The problem of identity of invention does not depend on a disclosure of body dimensions, tire sizes, or the like, none of which is specified in the claims. Identity, rather, depends on whether or not the brochure discloses structural features and characteristics that are precisely defined in the claims.

Thus, as to claim 1 (substantially set forth in (Op. [4] 777) of the three main elements, only two—(1) a hollow body member with transverse arched recess, and (2) axially aligned series of wheels mounted in the recess are present. Completely missing, and nowhere to be seen in photographs, drawings, words, or implication is element (3). This is the longitudinal draft beam which is both claimed and precisely described in the specification.[22] The conclusion is inescapable that if the drawings of the brochure included a draft beam, it would (but did not) show clearly in full lines in the plan view drawings on the back page as it does in Fig. 2 of the patent. And when the testimony of the Infringer's witnesses (see, e. g., notes 16, 17, 18, and 19, supra) is analyzed carefully, none refuted this fact.[23]

The deficiencies are even more marked as to claims 2, 3, and 4 as to which extensive limitations were imposed as a condition to the grant of the patent.[24] These claims are briefly paraphrased by the 6th Circuit (Op. [4] 777). Fully conscious that an effort to portray this device in ordinary terms risks inaccuracy, we would thumbnail it this way. They first detailed the body structure (less draft beam) and the two pair of pneumatic tired wheels. Next they described the shaft (axle) for mounting each pair of wheels, the fore-and-aft rocker support to which the two shafts (axles) were to be affixed and the method of mounting the ends of these supports in bearings to permit rotation. Although the axles (shafts) for the wheels were each rigidly fixed to the fore-and-aft rocker supports, this permitted the wheels to oscillate. In addition, some of these claims described the structure of the fore-and-aft supports in terms of strength members against compression forces on the lower leading, and back, edges of the arched recess.

Out of elements running from 7 (in Claim 2) to perhaps 10 (in Claim 4) as many as five distinctive elements were not revealed by the brochure. It does, of course, show (1) the unitary hollow body with transverse arched recess and (2) the two pair of pneumatic tired wheels,

22. As to it, the claim reads: a "draft beam extending longitudinally through the lower part of the body, centrally thereof [and] traversing said arched recess between two of such wheels and rigidly connecting opposite wall portions of the recess." This is illustrated in Figs. 1 and 2 and Spec. Col. 3, lines 9–40. It is identified as Item 11 or draft beam 11, 14–15.

23. Neither as to claim 1 or 2, 3, and 4 do we ignore the Williamson June 23, 1959 affidavit. Par. 2 of Judge Nordbye's order (Op. [6]) inquired: "Whether any pneumatic roller compactor displayed by [Patentee] at the aforesaid road show *corresponded substantially* with the disclosure in United States Letters Patent No. 2,610,557." Williamson's answer was: "5. Answering Paragraph No. 2 of the order the aforesaid number 1 machine as displayed at the July 1948 road show, did correspond substantially

with the disclosure in U.S. Patent No. 2,610,557, but such disclosure (drawings and specification) were not prepared until after the aforesaid tests have been completed, nor until the aforesaid effects were corrected * * *."

We reject this as immaterial since *public use* or *sale* is not urged. What was disclosed by the machine itself has nothing to do with what the brochure reveals as to those elements which are not thereby disclosed no matter how readily discernible they might have been to one crawling in, on, under or around the machine on display.

24. After rejections, the Examiner finally allowed the original claims 2, 13, 14, and 15 which were renumbered 1, 2, 3, and 4. Originally three claims directed to combinations including the draft beam structure, (2, 3, and 4) but only 2 was allowed to become claim 1.

and one might assume, although not expressly disclosed, that it showed (3) a shaft in the recess for mounting the wheels. But it nowhere showed (4) the fore-and-aft rocker beams running between each pair of wheels and mounted in bearings (5) fixed to the transverse bearing beam (6) in such a way as to allow the wheels to oscillate and, at the same time, serving as a strength member against compression forces against the recess walls.[25] Of course, it did show that in some way the wheels were bound to be mounted to permit oscillation.

Besides this graphic demonstration, witnesses for the Infringer either admitted, or could not deny, these facts. Thus witness Wood conceded that the rocker beam construction is not disclosed. So did Burcombe. Kaiser professed to disagree, but when pinned down he admitted the bearings are not shown and no fasteners indicated. He just assumed they are there. Similarly, Moore admitted that wheels as shown could be mounted in several different ways and still oscillate. Williams confirmed that he could readily think of three means of oscillating wheels.

It will not do, to suggest, as some of the witnesses implied and the Infringer argues, that anyone skilled in the art would know that wheels had somehow to be mounted on a shaft-axle and all know there are several ways of mounting wheels to permit them to oscillate either singly or in pairs. This patent, as allowed, taught specific means (or their equivalents) for accomplishing this. If one assumes that by merely seeing the drawings of exterior dimensions and photographs of a box-body mounted on rubber tired wheels, the skilled engineer, drawing on his experience, could create this structure, it is difficult to see how a patent could have been granted. The contention is just another plea for disregarding as utterly immaterial those specifically added limitations which were indispensable in securing the allowance of the patent.

The upshot is that on a consideration of the whole record, we regard as clearly erroneous the decision of the District Judge that the brochure disclosed the invention described in the claims. It is so in the sense that taking all of the testimony offered by the Infringer and crediting it 100% plus—both as to what it says and what it does not say—and balancing it against both the factual and expert testimony of the Patentee, we are left with the certain conviction that this patent which comes to us with its validity conclusively established is not disclosed by the brochure which leaves so many critical elements of the claims unrevealed, United States v. United States Gypsum Co., 1948, 333 U.S. 364, 396, 68 S.Ct. 525, 92 L.Ed. 746; Oil Screw Noah's Ark v. Bentley & Felton Corp., 5 Cir., 1963, 322 F.2d 3; W.R.B. Corp. v. Geer, 5 Cir., 1963, 313 F.2d 750. It is so also in the sense that this critical fact finding was not made in the light of the correct controlling legal principles. United States v. Williamson, 5 Cir., 1958, 255 F.2d 512, 515; McGowan v. United States, 5 Cir., 1961, 296 F.2d

---

**25.** Thus, e.g., for claim 3 the matters in italics represent limitations imposed in the patent prosecution and not disclosed in the brochure:
"*A shaft in the recess*
   *for mounting* each pair *of wheels*
A fore-and-aft extending *support in the recess*
   *for each shaft*
   *positioned between the wheels of each pair*
   *with the support oscillatably mounted and*
   *with its axis* fixed with respect to the body member,
whereby *the wheels of each pair are free to oscillate about the axis of said supports, and*
A *bearing beam*
   *disposed at each lower end of the transverse recess and in which the fore-and-aft supports are mounted,*
   *The wheel supporting shafts being parallel with and equidistantly spaced from said bearing beams * * *.*"

252, 254; Davis v. Parkhill-Goodloe Co., 5 Cir., 1962, 302 F.2d 489, 491.

This makes it unnecessary for us to consider the argument urged by the Patentee that the significance of the prior publication under § 102(b) is something quite different from its use as prior art under § 103. Likewise, we need not determine whether we do or do not agree with the Eighth Circuit's disposition of this theory. (Op. [8] 417).

Thus, as must to all living things, an end comes to this case here. At least we hope so. It goes back now for the entry and enforcement of the judgment previously directed (Op. [9] 598–600, 610–611).[26]

Reversed.

---

26. This disposition automatically affirms the Trial Court's refusal to grant equita-

ble relief to the Infringer and the cross appeal is therefore affirmed.