**MMAR GROUP, INC., Plaintiff,**

v.

**DOW JONES & CO., INC. and Laura Jereski, Defendants.**

**No. Civ.A. H–95–1262.**

United States District Court,
S.D. Texas,
Houston Division.

April 8, 1999.

Kenneth Morris, Mark Harwell, Morris & Campbell, Houston, TX, for plaintiff.

David H. Donaldson, Jr. R. James George, Jr., George Donaldson & Ford, Austin, TX for defendants.

*MEMORANDUM OPINION*

WERLEIN, District Judge.

Pending is Defendants' Amended Rule 60(b) Motion (Document No. 286), to which Plaintiff MMAR Group, Inc. has filed its Response in Opposition. Defendants' motion was filed after the filing of Defendants' Notice of Appeal from the Final Judgment, which divested this Court of further jurisdiction. *See Alvestad v. Monsanto Co.,* 671 F.2d 908, 911 n. 2 (5th Cir.1982). Although this Court has power to consider and to deny a Fed.R.Civ.P. 60(b) motion for new trial while an appeal is pending, it cannot grant such a motion without leave of the Court of Appeals. *See Lairsey v. Advance Abrasives Co.,* 542 F.2d 928, 932 (5th Cir.1976). After Defendants' Rule 60(b) motion was filed, the Court of Appeals ordered a stay of the appeal pending this Court's consideration of the Rule 60(b) motion.

The parties have now concluded additional discovery pertinent to the Rule 60(b) motion, conducted under the oversight of Special Master, Tom Cunningham, Esq., who was appointed by this Court pursuant to agreement of the parties. When this discovery was completed, Defendants filed their Amended Rule 60(b) Motion, moving for relief from the Final Judgment pursuant to Fed.R.Civ.P. 60(b)(3) and (b)(2), which motion is now before the Court. A full record has been presented by the parties, including excerpts of deposition testimony, affidavits, and numerous exhibits, and both sides have ably briefed their positions. On March 23, 1999, the Court also heard oral arguments presented by counsel for both sides.

### Rule 60(b) Standards

■ Rule 60(b)(3) provides that the Court may relieve a party from a final judgment because of "fraud (whether heretofore denominated intrinsic or extrinsic), misrepresentation, or other misconduct of an adverse party." The Fifth Circuit has summarized the requirements for Rule 60(b)(3) as follows:

One who asserts that an adverse party has obtained a verdict through fraud, misrepresentation or other misconduct has the burden of proving the assertion by clear and convincing evidence. The conduct

complained of must be such as prevented the losing party from fully and fairly presenting his case or defense. Although Rule 60(b)(3) applies to misconduct in withholding information called for by discovery, it does not require that the information withheld be of such nature as to alter the result of the case. This subsection of the Rule is aimed at judgments which were unfairly obtained, not at those which are factually incorrect.

*Rozier v. Ford Motor Co.,* 573 F.2d 1332, 1339 (5th Cir.1978) (internal citations and footnote omitted). In *Rozier* the Fifth Circuit observed the "greater discretion" of district courts within one year after the entry of a Final Judgment

> to balance the policy of finality of judgments against the other salutary policies embodied in the alternate grounds for relief provided in subsections (1) through (3) of Rule 60(b). Essentially, this discretion, as guided by the Rule, furnishes an escape valve to protect the fairness and integrity of litigation in the federal courts.

*Id.* at 1338–39.

■■■■ "Misconduct," as used in Rule 60(b)(3), does not require a showing of "nefarious intent or purpose as a prerequisite to redress." *Anderson v. Cryovac, Inc.,* 862 F.2d 910, 923 (1st Cir.1988).

> For the term ["misconduct"] to have meaning in the Rule 60(b)(3) context, it must differ from both "fraud" and "misrepresentation." Definition of this difference requires us to take an expansive view of "misconduct." The term can cover even accidental omissions—edgewise it would be pleonastic, because "fraud" and "misrepresentation" would likely subsume it. *Cf. United States v. One Douglas A–26B Aircraft,* 662 F.2d 1372, 1374–75 n. 6 (11th Cir.1981) (to avoid redundancy, "misrepresentation" in Rule 60(b)(3) must encompass more than false statements made with intent to deceive). We think such a construction not overly harsh; it takes scant imagination to conjure up discovery responses which, though made in good faith, are so ineptly researched or lackadaisical that they deny the opposing party a fair trial. Accidents—at least avoidable ones—

should not be immune from the reach of the rule. Thus, we find ourselves in agreement with the Fifth Circuit that, depending upon the circumstances, relief on the ground of misconduct may be justified "whether there was evil, innocent or careless, purpose." *Bros. Inc. v. W.E. Grace Manufacturing Co.,* 351 F.2d 208, 211 (5th Cir.1965), *cert. denied,* 383 U.S. 936, 86 S.Ct. 1065, 15 L.Ed.2d 852 (1966).

*Id.*

■■■■ Rule 60(b)(2) provides that the Court may relieve a party from a final judgment because of "newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under Rule 59(b)."

> To succeed on a motion brought under 60(b)(2) based on newly discovered evidence, the movant must demonstrate (1) that it exercised due diligence in obtaining the information and (2) "the evidence is material and controlling and clearly would have produced a different result if presented before the original judgment."

*New Hampshire Ins. Co. v. Martech USA, Inc.,* 993 F.2d 1195, 1200–01 (5th Cir.1993) (footnotes omitted) (quoting *Brown v. Petrolite Corp.,* 965 F.2d 38, 50 (5th Cir.1992)). "The newly discovered evidence must be in existence at the time of trial and not discovered until after trial." *Longden v. Sunderman,* 979 F.2d 1095, 1102–03 (5th Cir.1992).

### *Background for the Instant Motion*

MMAR, which was a Houston brokerage firm that bought and sold securities for its customers, brought this libel action for recovery of damages occasioned by allegedly false and defamatory statements contained in an article ("Article") written by Laura Jereski and published in *The Wall Street Journal* on October 21, 1993. It was MMAR's contention that the libelous content of the Article caused MMAR to go out of business. Numerous specific statements in the Article were alleged by MMAR to have been false and defamatory. After rulings on Defendants' motions for summary judgment and a full trial to the jury, eight statements were submitted for the jury to determine whether

the statements when published were both false and defamatory when considered in the context of the Article as a whole. The jury found in MMAR's favor that five of the statements were libelous, but returned a verdict for Defendants on the remaining three statements. Final Judgment on the verdict was entered in MMAR's favor for $22,700,000 in compensatory damages, plus pre-judgment and post-judgment interest, which by now would appear to have brought the total judgment to nearly $32 million.[1] The Court's Memorandum and Order entered November 6, 1997, disposed of all post-verdict motions. Defendants filed their Notice of Appeal to the United States Court of Appeals for the Fifth Circuit.

In the first half of 1998 one of MMAR's former employees, William A. Fincher, initiated contacts with representatives of Dow Jones. MMAR had assigned to Mr. Fincher a 4.4 percent interest (after deduction of legal fees and costs) in any recovery that MMAR received from Defendants.[2] Mr. Fincher also had an intimate knowledge of MMAR's vast tape recording system and its accumulated reels of taped conversations. By late May, 1998, Dow Jones's lawyer, Mr. David Donaldson, had personally interviewed Mr. Fincher and had heard some of Mr. Fincher's charges about MMAR's wrongdoing in connection with the Dow Jones lawsuit. Defendants thereupon moved the Court for opening of discovery on a Rule 60(b) Motion.

Mr. Donaldson further interviewed Mr. Fincher in the summer, 1998. Mr. Fincher related that MMAR had tape recordings of conversations that were relevant to this litigation but that had not been produced by MMAR, that Fincher himself had copied dozens of these tapes and had them in his possession, and that Fincher in 1993 and thereabouts, had been assigned by MMAR's CEO Cory Miner to listen to vast numbers of tape recorded conversations that were being reviewed in connection with various litigation in which MMAR was involved. Mr. Fincher said that during 1993 he listened to tapes twelve to eighteen hours a day, seven days a

week. He told Mr. Donaldson that as he got deeper into the tapes, he started saving for himself copies of everything that sounded suspicious to him or that he felt reflected Cory Miner's business practices. Mr. Fincher further reported that in 1994 Mr. Miner began raising with him the question of whether certain conversations could be "surgically erased" from the tape recordings, and that Mr. Miner began pressuring Mr. Fincher in 1995 to erase certain of the tapes, which Mr. Fincher stated that he declined to do.

Mr. Donaldson had his last conversation with Mr. Fincher on July 2, 1998, at which time Mr. Fincher told him some of the foregoing and made a number of additional charges of misconduct against MMAR and its principals related to the litigation with Dow Jones and a variety of other subjects. Mr. Fincher did not implicate the attorneys who represent MMAR in this case as being responsible for or aware of MMAR's misconduct, nor do Defendants. Within the week that followed the July 2, 1998, meeting, and before his oral deposition could be taken as part of the Rule 60(b) discovery, Mr. Fincher died in a private plane crash in Belize. The Rule 60(b) discovery brought to the surface a number of audiotape recorded conversations that were not produced before trial, and considerable other information not previously disclosed. Defendants then filed their Amended Rule 60(b) Motion that is now before the Court.

### Discussion of the Amended Motion

█ Defendants argue that, after the trial, they discovered that MMAR withheld, destroyed, and altered evidence that was central to certain of the claims and defenses in this case, and therefore the Final Judgment must be set aside. Defendants contend that there were numerous audiotapes, transcripts and other materials that were known to MMAR during pretrial discovery and were in its possession, custody or control, which were required to be produced by MMAR in response to Defendants' discovery requests,

---

1. Plaintiff also was awarded Judgment against Defendant Jereski for $20,000 in exemplary damages.

2. This was one of several assignments of interest in the potential recovery that MMAR had made to valued former employees.

and were not produced. The withheld materials contain statements or admissions made by various officers and employees of MMAR that bear upon the truth of three of the five statements in the Article that the jury found were false and defamatory. Defendants contend that MMAR's failure to produce the materials prevented them from fully and fairly presenting their defense.

MMAR denies that it engaged in fraud or other misconduct and argues that Defendants have failed to prove the required elements of a Rule 60(b) motion with the necessary clear and convincing evidence. MMAR further contends that Defendants did not act with due diligence in pursuing pretrial discovery and bringing on for hearing by the Court various "General Objections" that MMAR routinely lodged as a basis for not producing requested items. MMAR also defends its conduct with the claim that it complied with the only discovery order that the Court rendered during the pretrial discovery phase.

The Court finds from clear and convincing evidence that several of the audiotapes that were not produced before the trial contain conversations that would have been extremely helpful to Defendants, and highly relevant, in defending against MMAR's allegation that it had been libeled by Jereski's statement,

> For a time, MMAR hid the portfolio's losses by mismarking the IOs by three points or more, equal to as much as 10% of the bonds' market value, according to one former salesman.

The jury found this statement to be false and defamatory. Moreover, this mismarking statement is one of the most critical of the five statements found to have been false and defamatory.[3] It is such a serious charge, in fact, that MMAR's counsel in closing argu-ments characterized the statement as one that accused MMAR of "an intentional effort to hide something, an intentional crime being committed."

During the Rule 60(b) discovery, previously undisclosed tape recordings were produced that include a conversation between MMAR's Chief Compliance Officer and Chief Financial Officer, Larry Forrester,[4] and Sean Dobson, head of MMAR's trading desk, in which they speculate on why the National Association of Securities Dealers (NASD) wanted to interview Mr. Dobson in 1993. Forrester asked what did MMAR do, "except for mispricing?" Dobson responded that that was "pretty major."

Equally damning inferences regarding MMAR's mispricing of IOs may be drawn from another tape recorded conversation between MMAR principal Paul Brown and MMAR's salesman Richard Evans. In this July, 1992, conversation, in which the price of IOs owned by LASERS was discussed, Mr. Brown asked if Mr. Evans was "on market." Mr. Evans replied that he was not yet on market, but would be in "like three months." Further dialogue between these two revealed that the securities were priced "down to around 31 right now," but that they "did go 26–and–a–half." A reasonable inference is that the securities were at that time mispriced or mismarked by four and one-half points, or about 17 percent above what Mr. Evans knew the market to be. Such evidence would have been highly relevant to Dow Jones's defense that the mismarking statement was truthful.

A third audiotape produced during the Rule 60(b) discovery, and bearing on the mismarking statement, is of a conversation recorded on November 2, 1993, between MMAR's CEO, Cory Miner, and Chuck

---

3. It was the ruination of MMAR's entire business—caused by the five false and defamatory statements—that is the basis for MMAR's recovery of the immense damages award. Not every statement found by the jury to have been false and defamatory, however, could plausibly explain the sudden demise and failure of MMAR as a business entity within one month after the Article was published. For example, another of the five statements found by the jury to be libelous—that in one year MMAR "ran up $2 million in limousine bills"—may have led the reader to view the company as one that was foolishly self-indulgent and profligate with its *own* property. But this is quite different than the mismarking statement, which assails the basic integrity and fidelity of MMAR in handling its *customer's* property.

4. Mr. Forrester was also MMAR's Fed.R.Civ.P. 30(b)(6) corporate designee for pretrial discovery.

Ramsey, a former top MMAR officer and salesman. Mr. Ramsey, as it happens, had been Ms. Jereski's unnamed source for the mismarking statement contained in the Article, which had been published less than two weeks before this conversation occurred. Mr. Miner, apparently suspicious that Mr. Ramsey had been a source for Ms. Jereski, recorded the conversation by using a microphone concealed in what appeared to be a pen. Mr. Ramsey denied to Mr. Miner that he had been a source for Ms. Jereski and identified others whom he blamed. In discussing the truth of the mismarking statement, however, Mr. Ramsey was direct and insistent on what had actually happened:

> I heard Rich Evans stand there day after day, talk about [expletive deleted] trying to get that position in line. So if you don't think he was mismarking that position?

> * * *

> I know [profanity deleted] good and well he was, because I heard him standing there talking about it.

> * * *

> I heard Rich Evans and Sean Dobson standing there day after day ... as a matter of fact, I remember walking up one day and saying, "How's that position?" And Rich saying, "We brought in a quarter this month." I said, "Well, what's going on here?" He said, "Well, Vernon's leaving next month, and we're going to have it flat by the time he leaves."

> * * *

> So if you didn't know if these guys were mismarking that position ...

> * * *

> They were, Cory.

Although MMAR's CEO, Cory Miner, had personally taped this conversation, MMAR failed to produce it in pretrial discovery.

These three tapes in the aggregate, and each individually, contain significant evidence to suggest that MMAR had engaged in mismarking the LASERS's IOs as Ms. Jereski wrote in the Article. As already observed, this evidence went to the heart of one of the most damaging statements in the Article, the mismarking statement, which MMAR argued to the jury was false and amounted to wrongfully accusing MMAR of having committed a crime. Had MMAR produced these tapes, the tapes undoubtedly would have led Defendants materially to reshape their approach to certain other pretrial discovery and trial preparations, would have provided potentially fruitful if not dramatic, new avenues of cross-examination during trial, and would have provided substantial evidence from which to argue to the jury that the mismarking statement was true. Although MMAR advances different explanations and draws different inferences from some of this taped evidence, the evidence is clear and convincing that MMAR's failure to produce the tapes substantially interfered with Defendants' ability fully and fairly to present its own defense on a vital aspect of the case.[5]

5. MMAR does not dispute that the conversations recorded on these tapes are authentic and that they occurred before the trial. MMAR argues, however, that Defendants have not proved that Mr. Fincher discovered the first two of these recordings (the Forrester/Dobson and Brown/Evans conversations) and transferred them to cassettes before the trial. (No such contention is made with regard to the Miner/Ramsey conversation which, as observed above, was recorded not on the MMAR telephone taping system but rather by Mr. Miner himself.) This case was not tried until March, 1997. The evidence is that Mr. Fincher had been assigned to review for MMAR the master reels of audiotapes in 1992 or so, and that in 1993 he engaged in doing so on virtually an around-the-clock basis. He transferred from the master reels to cassette tapes conversations that he thought might be helpful or harmful to

MMAR in its ongoing lawsuits, and other MMAR officials or representatives could then review the recordings from the cassettes. There is no evidence that MMAR kept Mr. Fincher on this assignment after the March, 1997, trial. Moreover, Mr. Fincher stated to Mr. Donaldson that the cassettes were made before the trial. This statement, although hearsay, is consistent with the circumstantial evidence, including the fact that a cassette recording of the Forrester/Dobson conversation was found in MMAR's files during Rule 60(b) discovery. Regardless, it is uncontroverted that these particular recorded conversations were in MMAR's possession, at least on its master reels; were two-party conversations of which Messrs. Brown and Forrester, two of MMAR's top three leaders, had knowledge because they had been participants; and were recorded con-

A second group of tape recordings produced in connection with the Rule 60(b) discovery relates to the "frenetic trading/Raymond James" statement and to the "MMAR's capital position" statement, both of which the jury also found to be false and defamatory. Pertinent to these statements was another tape recording made by Cory Miner himself with his recording device placed in what appeared to be a pen. This recording was made at a meeting with the NASD, held November 8, 1993, shortly after publication of the Article. During this meeting Mr. Miner made statements seemingly at variance with the position taken by MMAR in the trial that the above-referenced statements in the Article were false and defamatory. This tape, personally recorded by Mr. Miner, was well-known to him and also should have been produced in the pretrial discovery. MMAR's failure to do so in response to Defendants' proper discovery requests was further misconduct, established by clear and convincing evidence, that frustrated and prevented Defendants from being able fully and fairly to contest MMAR's claims at trial and to present their defense.

Defendants knew before trial, of course, that MMAR, as a brokerage company, had an elaborate tape recording system sufficient to record simultaneously sixty different telephone lines that MMAR maintained at its Houston, Texas office. The recording system ordinarily operated twelve hours a day on each business day, and between twenty-three and thirty hours of audio could be recorded on each reel of tape. In resisting pretrial discovery and production of its audiotapes, MMAR regularly emphasized the magnitude of the system and MMAR's massive inventory of recorded conversations. On this premise, MMAR represented to the Court that "it is impossible to locate all responsive taped conversations that may exist."

What MMAR did not disclose to the Court or to Defendants before trial, however, was its ability to locate, or that it had located, particular tape recordings of conversations such as those recounted above, which MMAR's principals and its Rule 30(b)(6) corporate designee knew had occurred, knew

were recorded, and knew were covered by Defendants' discovery requests. They also knew, of course, that the conversations were potentially harmful if not fatal to certain trial positions taken by MMAR on crucial parts of the case. In making this finding, the Court has taken into consideration all of the circumstances established in the Rule 60(b) discovery, including evidence of MMAR's later spoliation of master reels of tape recordings even while this case has been on appeal in the Fifth Circuit, plus substantial evidence of Cory Miner's selective use of tapes to support his litigation positions while designing to avoid production of harmful recordings. For example, on one tape produced during the Rule 60(b) discovery, Cory Miner called Bill Fincher and said that he had just had a conversation with Richard Evans, and directed Mr. Fincher, "Just go back and be sure you pull the conversation I just had with him and erase it." The evidence submitted in connection with the Amended Rule 60(b) Motion is clear and convincing that MMAR engaged in serious misconduct during the pretrial discovery phase of this case, and that MMAR's misconduct prevented Defendants from fully and fairly presenting their defense.

MMAR's primary arguments against the Amended Rule 60(b) Motion are that Defendants were not sufficiently diligent in trying to obtain the damaging tapes before trial, that Defendants did not bring on for hearing and ruling by the Court the "General Objections" that MMAR routinely made to Defendants' production requests, and that the Magistrate Judge in her Order of March 14, 1996, relieved MMAR from producing for inspection and copying any tapes and transcripts other than those that she specifically ordered produced on that occasion. The background for this Order, and MMAR's series of representations to the Court, deserve consideration.

The Magistrate Judge's Order of March 14, 1996, ruled on Defendants' First Motion to Compel Production of Audiotapes. Defendants' First Motion to Compel stated that Defendants had served previous requests to produce telephone conversations that MMAR

versations that should have been produced in

response to Defendants' discovery requests.

had recorded on its extensive tape recording system, and that MMAR had produced no tapes. Defendants disclosed how they later discovered through other sources that hundreds of the telephone conversations already had been copied from bulky reel-to-reel tapes onto cassettes, thereby making access and duplication quite simple. Much of this had been done by MMAR in connection with other litigation, including the "Fundamental Broker's litigation," and Defendants specifically sought to copy those tapes and transcripts, together with all other requested audiotapes. MMAR vigorously opposed the production of any tapes, represented to the Court that the "tapes and transcripts that Defendants seek are wholly unrelated to the libelous *Article* that is the subject of this case," and further declared, "None of the information that Defendants seek is reasonably calculated to lead to the discovery of admissible evidence in this case." MMAR's opposition incorporated by reference its earlier *Response in Opposition to Defendants' Motion for Extension of Deadlines to Complete Discovery and File Motions,* which itself incorporated prior pleadings filed by MMAR in its resistance to discovery, including the so-called "Exhibit B." "Exhibit B" provided a somewhat detailed description of MMAR's telephone recording system and resulting inventory of more than 500 tapes, each twenty-three to thirty hours in length, which would take one person 230 years to review, while listening ten hours per day, 365 days per year. MMAR repeatedly presented "Exhibit B" as part of its incessant opposition to producing its audiotapes.

Confronted by these representations made by MMAR, the Magistrate Judge limited her Order to require that MMAR produce for inspection and copying the tapes and transcripts from the Fundamental Broker's litigation, together with all tapes of conversations occurring on October 21, 1993, and all tapes of conversations occurring on the date

Cory Miner announced that MMAR Group was discontinuing its business operations. The Magistrate Judge then explained, "Given the sheer number of tapes, no other tapes need be produced at this time. Should Defendants discover a need for additional tapes, Defendants shall attempt to resolve the issue with Plaintiff before filing another motion to compel."

The Magistrate Judge's requirement that the parties undertake to obtain by agreement the additional audiotapes that may be needed is consistent with this Court's practice to encourage parties to cooperate at every stage of the pretrial discovery process and to make liberal, voluntary productions of evidence and other tangible items that may lead to the discovery of evidence. This, after all, is an underlying purpose of Fed.R.Civ.P. 26(a)(1)(B), that requires the parties to provide to each other copies, or descriptions by category and location, of all documents, data compilations, and tangible things "in the possession, custody, or control of the party that are relevant to disputed facts alleged with particularity in the pleadings." This Court has never "opted out" of the foregoing Rule, which applied at all times during the pendency of this case in this Court. Moreover, parties are obligated to produce to their opponents not only favorable relevant items, but also unfavorable relevant items. As observed by the United States Supreme Court, pretrial discovery in this modern era is to

> make a trial less a game of blind man's buff and more a fair contest with the basic issues and facts disclosed to the fullest practicable extent.

*United States v. Procter & Gamble Co.,* 356 U.S. 677, 681–84, 78 S.Ct. 983, 986–87, 2 L.Ed.2d 1077 (1958).

Defendants in due course served their Second Document Request upon MMAR, to which MMAR filed one or more of its usual "General Objections," [6] to ten out of eighteen

---

6. MMAR routinely answered every set of written interrogatories and production requests with "General Objections," to which it assigned numbers one through five or six. Thus, in Plaintiff's Answers to Defendants' First Set of Written Interrogatories, Plaintiff's General Objection No. 1 claimed "Attorney-client privilege;" No. 2

claimed "Work-product privilege;" No. 3 claimed "Investigative privilege;" No. 4 claimed "Beyond legitimate discovery scope;" and No. 5 claimed "Undue burden and expense." These five General Objections, plus General Objection No. 6, to wit, that the request failed to satisfy the "Reasonable particularity" requirement, became

of Defendants' requests. (MMAR stated that it possessed no documents responsive to six of the remaining eight requests.) One of the requests was for all tape recordings of telephone or other conversations held between January 1, 1993, and November 18, 1993, (and transcripts of such conversations) not previously produced in which MMAR's "activities or relationship with the Louisiana State Employees Retirement System is discussed." This request required production of the recordings of both the Forrester/Dobson conversation and the Miner/Ramsey conversation, both of which contained references to MMAR's mismarking activities with respect to the LASERS's portfolio of IOs. MMAR refused production, and assigned its General Objection Nos. 4, 5 and 6 ("Beyond legitimate discovery scope," "Undue burden and expense," and "Reasonable particularity"). Defendants' counsel—attempting to resolve the matter outside of court as required by the Magistrate Judge—wrote to MMAR's counsel, "[I]n the event that MMAR Group obtains or generates a tape or transcript that is responsive to these requests and that has not yet been produced, we will expect it to be produced." MMAR still did not produce the tapes. Moreover, several weeks later when MMAR responded to Dow Jones's Second Motion to Compel, MMAR included in its Response two pages of declarations under the subtitle "The Context Of These Requests," in which MMAR made representations even more insistent and absolute than ever before:

> 6. ... MMAR is not a recalcitrant party fighting some version of trench warfare to prevent discovery. MMAR has voluntarily made full and complete disclosure of thousands upon thousands of documents, initially in compliance with the voluntary initial disclosure requirements of Rule 26, and subsequently, in response to Dow Jones' many specific requests.

> 7. ... MMAR has produced countless hours of audio tapes and transcripts of conversations spanning its entire history.

> 8. In short, Dow Jones has received a record of virtually every expense ever incurred or paid by MMAR, virtually every business transaction ever entered into by MMAR, and even virtually every word ever spoken by a MMAR employee, for which MMAR has maintained a record.[7]

MMAR argues that it should be excused for not having produced the potentially damaging tape recorded conversations involving MMAR's highest leadership, Cory Miner, Paul Brown, and Larry Forrester, which recordings have now been discovered during the Rule 60(b) proceedings, because Defendants did not again move the Court to compel such production after MMAR filed its General Objections. This argument is unavailing. The Magistrate Judge in her Order

---

boilerplate objections that MMAR repeated in its Responses to (i) Defendants' First Requests for Production of Documents and Tangible Things; (ii) Defendants' Second Request for Production of Documents and Tangible Things; and (iii) Defendants' Third Request for Production of Documents and Tangible Things.

MMAR would typically assert one or more of the General Objections on every request made for production. For example, in responding to Defendants' First Requests for Production of Documents and Tangible Things, Defendants made twenty requests, and MMAR raised one or more of the General Objections in response to *nineteen* of the twenty. Notwithstanding the Objection(s), however, MMAR would typically make additional responses indicating that it had produced the requested documents, or would produce the documents, or the like. Thus, in response to Request No. 14 in Defendants' First Requests, for "all ... audiotapes ..." in which MMAR employees, representatives, etc., discussed Dow Jones, Laura Jereski, and others,

MMAR stated that it had "already produced the documents in its possession," but to the extent that the Request included audiotapes, MMAR asserted Objection No. 5 "because it is impossible to comply due to the voluminous number of recorded conversations, and the extreme difficulty in review and production." Similar objections were made routinely to all requests for MMAR's audiotapes. Moreover, MMAR made no distinction between audiotapes contained only on the master reels, other recordings that had already been transferred from the master reels to cassettes, and yet other recordings that were not made on the telephone recording master reel system but were personally recorded by MMAR's CEO Cory Miner with the use of his portable pen-like microphone.

7. In paragraph 52 of MMAR's Response, which was part of a subsection opposing production of items that MMAR had given to *Forbes*, MMAR again set forth a global representation: "MMAR has already produced everything it has that could possibly have any relevance to this case."

entered March 14, 1996, ordered that Defendants attempt to resolve the issue with MMAR before filing another motion to compel production of additional tapes. Thereafter, the misrepresentations made by MMAR in its Opposition to Defendants' Second Motion to Compel Production, that it was "not a recalcitrant party fighting some version of trench warfare to prevent discovery," that it had been "in compliance with the voluntary initial disclosure requirements of Rule 26," that it had "produced countless hours of audio tapes and transcripts of conversations spanning its entire history," and that it had delivered to Dow Jones "virtually every word ever spoken by a MMAR employee, for which MMAR has maintained a record," were statements reasonably calculated to persuade this Court, to whom these representations were specifically addressed, as well as Defendants, that MMAR had been completely forthcoming, candid, and forthright in all of its pretrial production of evidence, including its audio recordings of conversations. Defendants understandably did not undertake again to move the Court to compel the production of audiotapes given the prior request of the Magistrate Judge combined with MMAR's unequivocal assurances addressed to the Court and served on Defendants in its Opposition to Defendants' Second Motion to Compel Production.

However, MMAR's principals and leaders, Cory Miner, Paul Brown, and Larry Forrester, who had themselves been parties to one or more of the critical, recorded conversations that were not produced, knew that full and truthful disclosures and production had not been made and that "tangible things in the possession ... of [MMAR] that are relevant to disputed facts alleged with particularity in the pleadings" were not being produced. *See* Fed.R.Civ.P. 26(a)(1)(B). MMAR's withholding of these audiotapes effectively prevented Defendants, among other

things, from fully and fairly presenting their defense as to the truthfulness of the "mismarking statement," the "frenetic trading/Raymond James statement," and the "MMAR's capital position" statement.[8]

### Conclusion

 From clear and convincing evidence the Court finds that MMAR obtained its favorable verdict through its own misconduct and misrepresentations; that MMAR's misrepresentations and other misconduct did prevent Defendants from fully and fairly presenting their defense; and that MMAR's verdict was unfairly obtained. This is precisely the type of case for which Rule 60(b)(3) furnishes "an escape valve to protect the fairness and integrity of litigation in the federal courts." *Rozier*, 573 F.2d at 1339. As in *Rozier*,

> the policy of deterring discovery abuses which assault the fairness and integrity of litigation must be accorded precedence over the policy of putting an end to litigation.

*Id.* at 1346.

Accordingly, if the United States Court of Appeals for the Fifth Circuit determines at this time to remand this case to the District Court for further proceedings, then upon reacquiring jurisdiction of the case this Court will, for the reasons stated herein, GRANT Defendants' Amended Rule 60(b) Motion and will order a new trial.

The Clerk shall notify all parties and provide them with a true copy of this Memorandum Opinion.

---

8. The Court finds no need to lengthen this paper by reciting all of the other evidence of MMAR's misconduct and misrepresentations or all of the ways in which Defendants were severely prejudiced in their ability fully and fairly to present their defense. In view of the findings made under Rule 60(b)(3), it is also unnecessary to discuss Defendants' arguments made under Rule 60(b)(2).