**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-5884-17T1

THOMAS GIBBONEY,

      Plaintiff-Respondent/
      Cross-Appellant,

v.

CATHERINE VERME f/k/a
VERME-GIBBONEY,

      Defendant-Appellant/
      Cross-Respondent.

_____

Submitted March 30, 2020 – Decided July 15, 2020

Before Judges Sumners and Natali.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Camden County, Docket No. FM-04-0691-11.

Earp Cohn PC, attorneys for appellant/cross-respondent (Michael William Kiernan, of counsel and on the briefs).

Pellettieri Rabstein & Altman, attorneys for respondent/cross-appellant (John A. Hartmann, III, of

counsel and on the briefs; Nicole Joy Huckerby, on the briefs).

PER CURIAM

In this post-judgment matrimonial action, defendant Catherine Verme appeals from three Family Part orders: 1) an August 4, 2017 order in which the court granted plaintiff's motion to vacate the parties 2012 Final Judgment of Divorce (FJOD) under Rule 4:50-1(f); 2) a July 18, 2018 order entered after trial which modified defendant's alimony award from a permanent obligation to a twelve-year limited term of $450 per week, emancipated the parties' younger son, and denied her request for attorney's fees; and 3) a September 8, 2017 order denying defendant's motion for reconsideration. Plaintiff Thomas Gibboney cross-appeals challenging both the amount and the term of the limited duration alimony award, the court's child support award, and the denial of his request for attorney's fees and reconsideration application.

We agree with defendant that the court erred in relying upon Rule 4:50-1(f) to vacate the 2012 FJOD. The court's factual findings made after a plenary hearing clearly established that defendant engaged in "other misconduct" as contemplated by Rule 4:50-1(c), and as such plaintiff's motion to vacate was untimely under Rule 4:50-2 as it was not filed within one year of the final judgment. As Rule 4:50-1(c) was applicable, plaintiff was not permitted to rely

on the "catch all" provision of Rule 4:50-1(f). Instead, the court should have considered plaintiff's application under the changed circumstances standard memorialized in the 2012 FJOD and in accordance with the earlier iteration of the alimony statute rather than the revised alimony statute, N.J.S.A. 2A:34-23. We accordingly reverse the August 4, 2017 order and remand for further proceedings regarding the alimony award consistent with our opinion.

We also reverse that portion of the court's July 18, 2018 order emancipating the parties' son, Luke, as he was clearly still within the sphere of his parent's influence at the time of plaintiff's application and accordingly remand for the court to reconsider the child support award to address Luke's emancipation and the other issues we have identified. We affirm the order to the extent it denied the parties' requests for attorney's fees.

I.

Plaintiff, then twenty-nine years old, and defendant, then thirty-eight years old, were married on January 13, 1996. Their first son, Collin, was born on April 4, 1997, and their second son, Luke, on January 16, 2000.

During the marriage, plaintiff worked as a nuclear medical technician with Virtua Health System. In 2011, his salary was $92,000, and he was also able to augment his salary by working occasional overtime. Defendant, a doctor of

pharmacy and licensed pharmacist, worked for GlaxoSmithKline (GSK) as a Senior Medical Information Scientist II with a salary of $98,667 in 2008. GSK characterized her job, which required extensive reading, writing and computer use, as "sedentary."

Defendant participated in the GSK Group Benefit Plan, which was administered by Hartford Insurance (Hartford) and provided long-term disability benefits to qualified employees. Defendant was eligible to receive seventy percent of her salary if deemed disabled under the terms of the policy.

On July 22, 2008, defendant experienced dizziness and nausea while driving to work. She consulted several doctors, complaining that she was unable to drive due to the foregoing symptoms and that she also felt unstable when walking. She was diagnosed with vestibular neuropathy and prescribed several medications, including Valium.

GSK agreed to let defendant work from home in the months that followed based upon a letter sent by a doctor who concluded that she had post-viral right-sided labyrinthitis and vestibular neuropathy and was unable to drive. In January 2009, however, GSK withdrew its permission for defendant to work at home, so she stopped working and collected six months of short-term disability benefits based upon the results of an independent medical examination (IME).

4

Thereafter, defendant applied for long-term disability benefits through Hartford and with the Social Security Administration (SSA). Dr. Sandra Paluzzi, defendant's primary care physician at the time, submitted a letter to Hartford on July 14, 2009 stating that defendant had vestibulopathy and vertigo, and was unable to work from home any longer due to "excessive visual stimulation which worsened her symptoms, including reading, evaluating data and computer work." Defendant also provided Hartford with medical records from Dr. Todd Rowan, who had diagnosed defendant with chronic vestibulopathy. On August 3, 2009, Hartford approved defendant's application for long-term disability benefits, effective July 19, 2009.

Shortly thereafter, upon learning that defendant had traveled to a baseball game in Cooperstown, New York, Hartford placed her under video surveillance. On four dates in September 2009 she was videotaped performing some of the activities she claimed her disorder precluded her from doing including: (1) traveling as a passenger in a car; and (2) standing, walking and reaching without support.

On December 1, 2009, Hartford representative Paul Lombardo met with defendant at the marital home to discuss her case. Defendant reviewed, edited, and signed affidavits in which she described her functionality. She then watched

the surveillance videotapes and confirmed that they accurately depicted her level of functionality. Defendant explained that her medications made her feel less dizzy and nauseated and enabled her to be more active.

On December 17, 2009, Hartford sent the surveillance footage, a transcription of the Lombardo interview, and copies of defendant's affidavits to Drs. Rowan and Paluzzi. Hartford asked whether they agreed, based upon this new evidence, that defendant currently had the ability to "function up to [40] hours per week with no activity limitations or restrictions." Both doctors answered, "yes."

Hartford terminated defendant's long-term disability benefits on January 14, 2010. In a letter of that date to defendant, Hartford advised that it had concluded that she no longer met the policy definition of "disabled" and that she was capable of performing the essential duties of her sedentary position without limitation. Hartford explained that, in reaching this determination, it had considered the surveillance videotapes, the Lombardo interview, defendant's December 2009 affidavits, medical records received from Drs. Paluzzi and Rowan, and the letters from those doctors agreeing that defendant could go back to work.

A-5884-17T1

On February 15, 2010, defendant, who had obtained copies of the December correspondence between Hartford and Drs. Rowan and Paluzzi, wrote to these doctors disputing the "false and misleading" information provided to them by Hartford, advising that she was appealing its determination and asking for their assistance.

On July 12, 2010, defendant's counsel, David Rochman, who had taken over the matter from defendant's original counsel Thomas Hagner on May 6, 2010, filed an internal appeal with Hartford, relying in part on a July 12, 2010 letter from Dr. Rowan. In that letter, Dr. Rowan stated that defendant's chronic vestibulopathy seemed to be clinically stable, she required Valium in order to drive and could not drive on busy highways, she had reached maximal medical improvement, and because of defendant's driving limitations and difficulty with head motions, she could not work effectively in her job.

Hartford retained Drs. Sergio Loaiza and Thomas Klein to independently and separately review defendant's medical records. Both doctors issued reports detailing the materials they considered, which included separate conversations with Dr. Rowan, and each determined that defendant had no functional limitations and could work up to forty hours per week at her current job.

A-5884-17T1

Hartford upheld its decision and sent a letter dated November 22, 2010 to Rochman advising of its determination "to deny benefits [based] on policy language and all of the documents contained in the claim file" including the reports from Drs. Loaiza and Klein. It acknowledged defendant's use of Valium. Hartford advised that Rochman could request copies of all the documents relevant to its decision, as well as file a civil action under section 502(a) of ERISA.

On May 5, 2011, Rochman filed an ERISA action on defendant's behalf against Hartford in state court seeking reinstatement of her long-term disability benefits. Hartford removed the matter to federal court. On December 20, 2011, Hartford's attorney provided Rochman with Hartford's initial disclosures, which included Hartford's administrative claim file and the CD's containing the surveillance videotape.

Meanwhile, plaintiff filed for divorce after more than sixteen years of marriage one year earlier on November 4, 2010. In his complaint, he alleged that both parties had sufficient means to support themselves. Defendant, through Rochman (whom she had also retained as her divorce attorney), filed an answer and a counterclaim for divorce. Plaintiff was never ordered to and did

not pay any pendente lite alimony or child support to defendant from November 2010 through January 2012.

In early 2011, the parties filed cross-motions regarding outstanding discovery. By order dated March 29, 2011, the trial court directed both parties to fulfill their discovery obligations and directed defendant to provide plaintiff with: (1) "full and complete responses to all prior discovery requests within thirty (30) days, and relating documentation"; (2) "copies of all medical records for the past three . . . years" and "an authorization allowing [plaintiff] to obtain same"; and (3) "any and all documentation relating to the claim with the Hartford disability policy, the [SSA] and any claim with the state of New Jersey within thirty (30) days." The next day, defendant e-mailed plaintiff and said she would gather and forward whatever medical records she had.

Two months later, plaintiff's counsel, Howard Mendelson, who believed that there would not be an alimony award because defendant had not proven her alleged disability with the limited medical records she had produced, moved in limine to bar defendant from using any unproduced evidence supporting her alleged disability in the divorce trial. The trial court granted plaintiff's motion by order dated May 31, 2011. The trial court also barred defendant from presenting testimony regarding her disability from any witness not identified by

May 18, 2011, and ordered her to submit to an IME with Dr. William Wolfe. Notably, Dr. Wolfe subsequently opined in a report dated June 24, 2011 that defendant had limitations as a result of her disorder. Dr. Wolfe's report was not introduced at trial.

On August 15, 2011, immediately prior to the commencement of the divorce trial, defendant attempted to file an untimely motion in limine seeking enforcement of the March 29, 2011 order. During oral argument, Rochman asserted that the defense had complied with the order and produced all the medical records and documents related to the Hartford appeal, but was owed discovery from plaintiff. Mendelson disputed Rochman's claimed compliance with the March 2011 order, but nonetheless represented that he was ready to proceed to trial and willing to let the court handle any discovery issue that arose. After finding that defendant's motion had been brought too late for consideration and acknowledging that it appeared that there were still discovery deficiencies on both sides, the trial court decided it would not delay the trial and would fashion appropriate remedies as the need arose.

The parties' divorce trial started on August 15, 2011. On September 7, 2011, the SSA awarded defendant full disability benefits, plus subsidiary support benefits for each of the parties' minor children, based on a finding that

10

she suffered from disequilibrium and bilateral hearing loss which dated back to January 12, 2009. Because the SSA concluded that defendant's entitlement to benefits began in July 2009, it paid her and the children retroactive benefits for 2009 and 2010.

In light of the SSA's determination, plaintiff did not present any evidence at trial to rebut defendant's now-presumed disability. According to Mendelson and Rochman, defendant's SSA award led everyone to believe that her Hartford benefits would be reinstated, and that plaintiff would ultimately be relieved of any alimony award.

During the trial, defendant testified that it was her understanding that Hartford terminated her long-term disability benefits "based on policy language, that I had a sedentary job. And that was all they said . . . that's all I recall is their understanding was policy language." Also at trial, Rochman stated that plaintiff's counsel had all the requested disability-related records he had in his possession. Defendant later testified to the same.

On March 28, 2012, the trial court entered the FJOD. Finding that defendant's disability was "unrefuted," the court awarded defendant permanent alimony of $450 per week effective January 5, 2012. As each party was to serve as the parent of primary residence for one of their sons, the court ordered

plaintiff to pay $68 in weekly child support to defendant and defendant to pay $87 to plaintiff. The net result was that plaintiff received a weekly credit of $19 towards his alimony payments and would pay defendant $431 each week. With respect to defendant's retroactive SSA payments, the trial court further instructed that "said sums shall be retained by [d]efendant in lieu of any retroactive reward of alimony and/or child support prior to January 5, 2012."

Finally, the trial court emphasized that a reinstatement of defendant's long-term disability benefits through Hartford would constitute a "changed circumstance" entitling plaintiff to either a reduction in, or termination of, his alimony obligation.[1] Accordingly, the court directed defendant to "provide written notice to [p]laintiff of and concerning the status of the Hartford Insurance claim including, but not limited to, the date, time and amount of any award and/or payment to be made in connection therewith."

Two years later, on March 13, 2014, the federal district court granted summary judgment to Hartford in the ERISA action. In its decision, the court found that defendant had not "adequately addressed or refuted" the evidence

_____

[1] Neither the 2012 FJOD nor the court's March 23, 2012 oral decision contained language that permitted any modification or termination of the alimony award based on the law at the time of any subsequent application, which precluded consideration of the amended alimony statute, N.J.S.A. 2A:34-23.

12

obtained by Hartford and that Hartford's decision was properly based upon "substantial evidence." Neither Rochman nor defendant advised plaintiff or his counsel of this determination.

Nearly two years later, in February 2016, the parties filed post-judgment cross-motions seeking various relief. On February 12, 2016, the trial court filed an order resolving the motions and directing defendant to provide plaintiff with: (1) "the status of her disability claim with Hartford . . . pursuant to the parties' [FJOD], including the date, time and amount of any award and/or payment received by defendant"; and (2) "proof of her current disability status through SSA, including the current income and benefit statement and any subsequent re-evaluations conducted by the SSA since the date of the parties' divorce."

Thereafter, defendant provided plaintiff with the last page of the March 2014 federal court opinion dismissing her ERISA claim. Plaintiff obtained the entire opinion and claimed that this was the first time he learned of the Hartford surveillance, the purpose of the Lombardo meeting, defendant's affidavits, the revised opinions of Drs. Rowan and Paluzzi, the opinions of Drs. Loaiza and Klein, and the January 14, and November 22, 2010 letters explaining Hartford's decision to terminate defendant's benefits.

13

Plaintiff thereafter hired investigators to conduct surveillance of defendant on five dates in May, and three dates in June 2016. The resulting videotapes showed defendant: (1) walking about, including up a hill and on uneven ground, without assistance or difficulty; (2) carrying bags; (3) reaching over her head to spray insect spray; (4) gardening; (5) taking out the trash; and (6) attending a lengthy and busy swim meet in the bright sun. The assigned investigators, Richard Narisacki and Gerard Russ, prepared reports detailing all of defendant's activities.

On July 7, 2016, plaintiff filed a motion to reopen the FJOD and vacate the alimony and child support awards based upon fraud under "Rule 4:50[,]" or to modify these aspects of the FJOD based upon changed circumstances. In a letter brief, plaintiff further specified that he was seeking relief under "Rule 4:50-1(f) or Rule 4:50-3." He alleged that the information relied upon by Hartford to terminate defendant's long-term disability benefits had been wrongfully withheld from him in the divorce case, and that he had been deprived of the opportunity to rebut the presumption created by the SSA determination that defendant was disabled which was the basis for the 2012 alimony and child support awards. He sought a plenary hearing and an award of counsel fees. In further support of this motion, plaintiff provided text messages he had received

from defendant where she mentioned performing a variety of activities (i.e., power washing, doing computer work, shoveling snow, traveling to help hurricane victims), notwithstanding her alleged disability.

In an opposing certification dated August 4, 2016, defendant asserted that she:  (1) had relied on Hagner and Rochman to decide what was disclosed during the divorce trial; (2) did not understand the "insurance coverage lingo" in the January 2010 Hartford letter explaining why her benefits were being terminated; (3) nonetheless, accurately testified at the divorce trial as to why her benefits were terminated; (4) never said that she was so incapacitated by her disorder that she could not perform the activities of daily living with the assistance of her medication; (5) was medicated at the time she was videotaped; (6) did not engage in any activities that suggested that she could go back to work; and (7) was found by the IME performed by Dr. Wolfe to have "limitations."  She also cross-moved for various financial relief.

By order filed August 19, 2016, the trial court granted plaintiff's request for a plenary hearing regarding his motion to reopen or modify the FJOD.  It conducted a plenary hearing over seven days between December 13, 2016 and May 16, 2017.  Notably, during the hearing, it was repeatedly stated that plaintiff was seeking relief for fraud under Rule 4:50-1(c).

15

Plaintiff testified that before he moved out of the marital home, he saw defendant gardening, cooking, taking out the garbage, cleaning, going up and down stairs and using the computer. He felt that she behaved "normally" around the house. He claimed that she drove "continuously" during this period, although he acknowledged that she said she could not drive on busy roads.

Plaintiff denied that he helped defendant with either her SSA or Hartford disability applications or with the Hartford litigation. During the divorce litigation he received medical records but nothing regarding the Hartford benefits or litigation. Plaintiff acknowledged that he knew that an interview with Lombardo had occurred, and that defendant told him when her benefits were terminated. On cross-examination, plaintiff further acknowledged that he had observed defendant occasionally stop and stabilize herself, that excessive computer work made defendant feel dizzy, Dr. Wolfe's IME report said that defendant did not have the ability to work at that time, and he did not know whether defendant had taken her medicine on the days she was videotaped.

Mendelson testified that during the divorce proceedings, the defense never provided him with: (1) the affidavits defendant signed on December 1, 2009; (2) the Hartford surveillance videotape; (3) the December 17, 2009 letters from Hartford to Drs. Paluzzi and Rowan and their responses; (4) the letters defendant

sent to these doctors on February 15, 2010 and April 26, 2010; (5) the January 14, 2010 termination letter from Hartford to defendant; (6) the letters exchanged between Rochman and Hartford dated July 12, 2010, July 15, 2010, and November 22, 2010; and (7) the 500-page Hartford file furnished to Rochman on December 20, 2011.

Mendelson acknowledged that defendant's last minute SSA award created a presumption that defendant was disabled and that he so advised plaintiff. He recalled that, in light of this award, and because the items listed above had not been disclosed by the defense, he believed that defendant's Hartford disability benefits would be reinstated and that she ultimately would not be entitled to alimony. Mendelson stated that had there been full disclosure, he would not have been under this misapprehension and would have attempted to rebut the presumption that defendant was disabled and incapable of supporting herself using the withheld information.

Mendelson nonetheless acknowledged that he did not serve subpoenas on Hartford or the SSA. He explained that he had no reason to think that full disclosure had not been made in light of the trial court's orders, Rochman's repeated assertions at defendant's deposition and in court that all requested

records had been provided, and defendant's testimony that Hartford terminated her benefits because of policy language that she had a sedentary job.

Rochman denied that he withheld discovery in the divorce case. He testified that he requested defendant's prior attorney's file when he took over the Hartford appeal in May 2010, but he received only random documents and did not recall seeing any medical reports. He conceded, though, that he must have had the Hartford termination letter when he filed the July 2010 internal appeal.

Rochman insisted that he furnished Mendelson with everything he had in accordance with the March 29, 2011 order, although he could not recall what he provided. He acknowledged that he said that plaintiff had all Hartford records at the March 29, 2011 hearing, and again on August 15, 2011. He could not recall if he forwarded the Hartford disclosure he received in December 2011, but justified any impropriety by stating that he no longer had an obligation to produce anything after the court "closed" discovery with its May 2011 order. Rochman also asserted that some of the Hartford disclosure did not qualify as "medical records" that had to be provided to Mendelson, but conceded that the March 2011 discovery order was not limited to medical records.

Defendant testified that she suffered from a vestibular disorder that caused her to experience a lack of balance and nausea, which increased when she had

18

to move her eyes back and forth or deal with extreme sensory stimulation. She maintained that her symptoms were the same as they had been in 2009, and that it was only by taking Valium three or four times a day that she could "talk, stand, or walk," or drive at very low speeds on back roads.

Defendant insisted that she never intended to hide anything during the divorce trial. She claimed that contrary to plaintiff's testimony, he helped her with her first SSA application and with her Hartford disability application, she told plaintiff about the Hartford surveillance video on December 1, 2009, and plaintiff read the January 2010 termination letter. Defendant questioned the relevancy of the 2009 surveillance videotapes, portions of which were played during her testimony, emphasizing that they did not show her working as a pharmacist or working full-time on a computer.

Defendant maintained that she provided everything she had regarding the Hartford claim to Hagner and Rochman, and that she had relied upon Rochman to comply with the March 2011 order. She believed that Rochman should have been able to locate relevant documents in the files furnished by Hagner and Hartford. Defendant also stated that she burned a copy of the disc containing her SSA file for plaintiff at some point in time.

Defendant noted that the SSA and Hartford each defined "disability" differently. She reiterated her belief that Hartford terminated her benefits based upon on definitional policy language and her sedentary job description. She did not recall if she provided more details regarding the contents of the termination letter during the divorce trial.

On August 4, 2017, the trial court granted plaintiff's motion to vacate the support provisions of the FJOD pursuant to Rule 4:50-1(f) and ordered a new trial as to alimony and child support. The court declined to award counsel fees to either party.

In its accompanying written opinion, the trial court first found that defendant's attorney "understood that he was required to provide Hartford documents to [plaintiff's attorney] as they were received[,]" but "the only document [he] provided . . . was a copy of the Hartford disability policy." It also found that based upon a March 30, 2011 email by defendant to plaintiff, "defendant had in her possession all of the documents ordered to be provided in the March 29, 2011 court order." Those documents included: (1) defendant's December 1, 2009 affidavits; (2) the 2010 letters from Rowan and Paluzzi to Hartford; (3) the January 14, 2010 termination letter from Hartford to defendant; (4) the February 15, 2010 letter defendant sent to Rowan and Paluzzi; (5)

Rochman's July 12, 2010 notice of appeal to Hartford; (6) the November 22, 2010 letter from Hartford to Rochman denying defendant's appeal; (7) the Loaiza and Klein reports; and (8) the Hartford administrative file and surveillance videotapes. The court further found that defendant and her attorney's "failure to provide these documents constituted a violation of the March 23, 2011 discovery order and the court's mandate for continuing disclosure of documents."

The trial court rejected plaintiff's argument that the non-disclosure of these documents constituted fraud under Rule 4:50-1(c) and was therefore untimely under Rule 4:50-2 as it was filed "more than one year" after the March 28, 2012 FJOD. It also found that plaintiff was not entitled to relief under Rule 4:50-3 because plaintiff had failed to establish that defendant had committed a "fraud upon the court." In the court's view, plaintiff had simply established that defendant had failed to comply with a court order, which was a "far cry from perjury." In this regard, the court found that although defendant failed to provide further explanation, she did not testify untruthfully during the divorce trial that Hartford terminated her disability benefit because of language in its disability policy.

Similarly, the court concluded defendant did not commit a fraud on the court when she testified that she could not drive, read, do computer work or deal with sensory overload, as those represented her subjective opinions. Moreover, even if her counsel made misrepresentations to the court, the court determined that defendant was not responsible under agency law for any willful misconduct by her counsel in which she did not participate and there was no proof here that defendant colluded with her attorney.

The trial court was satisfied, however, that there were exceptional circumstances which warranted the granting of relief under Rule 4:50-1(f) stating:

> Justice compels a re-trial on the issue of support so that plaintiff has an opportunity to present his case after a full disclosure of all relevant materials. Here, justice was not served in the initial trial because plaintiff was not in possession of all the facts and defendant and her attorney were obliged pursuant to a court order and directive to provide all the information in their possession . . . . [That] information was important and the failure of defendant and her counsel to provide the information denied plaintiff of a fair trial.

Accordingly, the trial court directed that a new trial be held to determine whether spousal and child support should be awarded and, if support was awarded, what amount should be awarded and for what duration of time.

Finally, in denying fees in connection with plaintiff's motion to vacate and the resulting hearing, the trial court explained:

> In this case, the court finds neither plaintiff nor defendant are entitled to fees because both parties violated the court's March 29, 2011 discovery order. As discussed in detail above, there were several documents in possession of defendant and/or Mr. Rochman that the order required to be turned over but never were. Similarly, under the March 29, 2011 discovery order, plaintiff was obliged to execute authorizations for disclosure of the credit line in 226 Sandringham, his life insurance policies, and his employment file, which he failed to do. Both parties have unclean hands and for that reason, neither party should be awarded fees in connection with this motion and plenary hearing.

Thereafter, child support for the parties' oldest son, Collin, was terminated in a September 11, 2017 consent order effective August 1, 2017. Both parties then unsuccessfully moved for reconsideration of the August 4, 2017 order and, on September 15, 2017, the trial court denied defendant's motion for a stay. Defendant argued in part that the court had improperly granted relief under Rule 4:50-1(f) when the conduct at-issue fell under subsection (c) and its one-year limitations period as her actions, along with her counsel, constituted "other misconduct" under the Rule. The trial court denied defendant's motion, ruling that her failure to comply with a court order constituted "contumacy," not fraud, and it ultimately was not important whether the facts fit within subsection (c) or

23

(f) because, even if defendant's conduct did amount to fraud, <u>Rule</u> 4:50-1 should be relaxed in the interest of fairness.

At the new trial, Narisacki, one of the investigators hired by plaintiff, testified that the portions of his videotape played in court, and as detailed in his report that was admitted into evidence, depicted defendant: (1) driving to a beauty supply store where she carried a basket and scanned shelves; (2) carrying a trash can out of the house and dumping it into a larger can; (3) gardening and spraying insect spray above her head; (4) spending one hour at a cemetery where she sat on the ground and got up without assistance; and (5) skipping stairs while stepping up onto her neighbor's patio.

Narisacki confirmed that he took additional, less notable footage and that he sent all of his footage to his office electronically. He stated that he made no edits to the footage and that what was played in court was exactly what he submitted and documented in his report. He did not know if the remainder of the tape was unedited.

Russ, the other investigator hired by plaintiff, testified that as reflected on the portions of his videotape played in court and detailed in his report defendant was captured: (1) carrying bags; (2) walking first to a bank and then over a curb and down landscaping to get to a Wawa; (3) rolling out a recycling bin; and (4)

A-5884-17T1

moving about and cheering enthusiastically while out in the bright sun at a four-hour crowded and loud swim meet. He similarly uploaded his videotape onto the company's secured server and did not believe that the tape had been edited by his employer.

Dr. Roger Behar, a neurologist, also testified on behalf of plaintiff that he conducted an IME of defendant on December 5, 2016, and reviewed her medical records and the surveillance videotapes, and thereafter prepared a report setting forth his conclusions. Behar reported that defendant's neurological exam was entirely normal, and she had no gait or balance issues.

After reviewing her medical records, and based upon her symptoms and negative test results, Dr. Behar initially disagreed with every diagnosis made by all but one of the eight doctors defendant saw during her numerous examinations and treatment. Behar discussed the tests performed and the findings and conclusions of each of these doctors (including Dr. Rowan and Dr. Paluzzi and defendant's current treating physician, Dr. Phillip Kramer), as well as the results of testing conducted by the Pennsylvania Balance Center (which did include one abnormal finding), and explained why he did not agree with the varying diagnoses made.

Notably, Dr. Behar initially agreed that the record supported Dr. Kramer's final diagnosis of persistent postural dizziness (PPD), a condition combining the symptoms of imbalance and an intolerance to experiencing and seeing movement. He explained that PPD made it impossible for sufferers to do things such as watch television, walk in a busy airport, or stand on an escalator.

When Dr. Behar subsequently watched the 2009 and 2016 surveillance videotapes, however, he realized that defendant's activities were incompatible with a PPD diagnosis. Dr. Behar emphasized that if defendant was afflicted by PPD, she would not have been able to tolerate the swim meet, shop in the beauty supply store, lean her head back and raise her arms above her head to spray for insects without falling, or navigate over uneven surfaces without assistance. He found these recorded activities the most telling signs that defendant did not have PPD.

Dr. Behar found no evidence that defendant had a neurological or vestibular condition. He believed that defendant suffered from either chronic subjective dizziness or was malingering, and that there was no reason she could not return to work. He did not believe that defendant was deriving much if any benefit from Valium, which he described as a marginally effective medication for dealing with dizziness.

A-5884-17T1

On cross-examination, Dr. Behar agreed: (1) he had based his conclusion regarding PPD on the surveillance video; (2) he was not taught in medical school to "examine" people by looking at surveillance video; (3) severe chronic subjective dizziness could manifest if someone were doing a great deal of reading, working extensively on a computer or driving at higher speeds; and (4) the surveillance videotapes did not show defendant working in a professional capacity. Dr. Behar nonetheless insisted that the surveillance video showed that defendant had a great deal of tolerance for movement around her.

Finally, with respect to the emancipation of Luke, defendant testified that Luke lived with her and had no plans to move out. She stated that he was graduating from high school in June and was planning on going to college. Although he had been accepted at nine colleges, she was not sure what was going to happen since he had received only $5500 in scholarship monies.

The trial court rendered its opinion and order on July 18, 2018. The court directed plaintiff to pay defendant $450 per week in limited duration alimony for twelve years, terminating March 28, 2024, under the revised alimony statute, N.J.S.A. 2A:34-23, and eliminated both parties' child support obligations. In determining its alimony award, the court acknowledged defendant's argument that "the court should utilize the alimony factors in place in 2012[,]" and

emphasized that the importance to the parties of whether to apply the revised alimony statute "rest[ed] almost exclusively on the fact that after the amendments, for a marriage of less than twenty years, 'the term of alimony shall not exceed the length of the marriage, except in exceptional circumstances.'" (quoting N.J.S.A. 2A:34-23(b)). The court nonetheless rejected defendant's argument stating that it "vacated the portion of the [FJOD] that required plaintiff to pay defendant alimony" and "[b]ecause there continues to be no final judgment of divorce that sets a duration of alimony and because it is 2018, the 2014 amendments apply to this case." The court proceeded to evaluate the fourteen factors set forth in the revised alimony statute and determined that defendant was entitled to twelve years of limited duration alimony.

With respect to emancipation of Luke, the trial court ruled that no child support should be awarded as he "is eighteen years old, has graduated from high school, and there is no evidence that he is enrolled in college or trade school." Finally, in denying any award of counsel fees, the trial court reviewed each of the factors set forth in Rule 5:3-5(c) to determine whether fees were warranted and concluded that because only one factor weighed in favor of each party, and these factors were entitled to little weight, neither party was entitled to a fee award.

Plaintiff moved for reconsideration as to the alimony termination date, which he contended should be January 5, 2024, based upon the FJOD, or November 4, 2022, because defendant ultimately received pendente lite support between November 2010 and March 2012 in the form of her retroactive SSA monies. While this motion was pending, both parties filed notices of appeal and the trial court denied plaintiff's motion for reconsideration because it no longer had jurisdiction over the matter.

This appeal and cross-appeal followed. Defendant raises the following issues in her merits brief:

> POINT ONE: THE PLAINTIFF DID NOT EXERCISE DUE DILIGENCE IN THE DIVORCE AND RELIEF IS PRECLUDED UNDER [RULE] 4:50-1.[2]
>
> POINT TWO: THE COURT ERRED WHEN IT GRANTED RELIEF UNDER [RULE] 4:50-1(f) WHERE THE FACTUAL BASIS OF SUCH RELIEF FALLS SQUARELY UNDER (c).
>
> POINT THREE: THE COURT ERRED WHEN IT ADMITTED SURVEILLANCE VIDEO ALONG WITH A DOCUMENT AUTHORED BY COUNSEL.
>
> POINT FOUR: THE COURT ERRED WHEN IT CONSIDERED THE PLAINTIFF'S MEDICAL EXPERT'S OPINION THAT WAS PREMISED

---

[2] We have reorganized the parties' point headings for ease of reference.

ENTIRELY ON SURVEILLANCE VIDEO WHICH HE ADMITTED IS NOT A METHOD OF DIAGNOSIS ACCEPTED IN HIS PROFESSION.

POINT FIVE: THE COURT ERRED WHEN IT FAILED TO ADMIT ALL THE DEFENDANT'S MEDICAL RECORDS RELIED UPON BY THE PLAINTIFF'S MEDICAL EXPERT.

POINT SIX: THE COURT ERRED WHEN IT APPLIED THE REVISED ALIMONY STATUTE.

POINT SEVEN: THE COURT ERRED WHEN IT EMANCIPATED THE PARTIES' MINOR CHILD.

POINT EIGHT: A RECONSIDERATION OF AN AWARD OF ATTORNEY FEES AND COSTS IS WARRANTED WHERE THIS COURT DETERMINES THAT THE FOREGOING ARGUMENTS WARRANT REVERSAL OR OTHER RELIEF.

Plaintiff raises the following points in his merits brief:

POINT ONE: THE TRIAL COURT PROPERLY DETERMINED THAT PLAINTIFF ACTED WITH DUE DILIGENCE DURING THE DIVORCE TRIAL HOWEVER [RULE] 4:50-1(f) PROVIDES FOR NO SUCH REQUIREMENT.

POINT TWO: THE TRIAL COURT PROPERLY GRANTED THE PLAINTIFF'S MOTION TO REOPEN THE PARTIES' AMENDED FINAL JUDGMENT OF DIVORCE

30

WITH RESPECT TO ALIMONY AND CHILD SUPPORT PURSUANT TO [RULE] 4:50-1(f).

POINT THREE:    THE    TRIAL    COURT PROPERLY    ADMITTED    2016 SURVEILLANCE VIDEO AS WELL AS A DOCUMENT DETAILING THE PORTIONS OF THE VIDEO PLAYED DURING THE PLENARY HEARING.

POINT    FOUR:    THE    TRIAL    COURT PROPERLY CONSIDERED DR. BEHAR'S CREDIBLE EXPERT OPINION.

POINT    FIVE:    THE    TRIAL    COURT PROPERLY    APPLIED    THE    REVISED ALIMONY STATUTE.

POINT SIX:  THE TRIAL COURT PROPERLY REFUSED    TO    ADMIT    DEFENDANT'S MEDICAL    RECORDS    REGARDING COMPLEX    DIAGNOSES    ABSENT TESTIMONY BY THE DOCTORS.

POINT    SEVEN:    THE    TRIAL    COURT PROPERLY DETERMINED THAT NEITHER PARTY SHALL PAY ONGOING CHILD SUPPORT TO THE OTHER.

POINT EIGHT:  THE TRIAL COURT ERRED IN    AWARDING    DEFENDANT    LIMITED DURATION ALIMONY OF $450 PER WEEK.

A. The Trial Court Erred In Determining That Defendant's    Earning    Capacity/Imputed Income Is $43,000 Gross Per Year.

31

1. The Trial Court Erred When Considering the Defendant's Absence from the Job Market By Failing to Consider the Willful and Voluntary Nature of the Absence, and By Failing to Consider Her Ability to Earn From the Outset in 2009.

2. Dr. Levine's Testimony and Opinion Do Not Support An Imputation of Only $43,000 Gross Per Year.

B. The Trial Court Erred In Determining The Defendant's Monthly Needs.

C. The Trial Court Erred in Determining The Plaintiff's Ability to Pay Alimony As Well As His Ability to Maintain A Reasonably Comparable Lifestyle.

D. The Trial Court Erred in Determining that Alimony Commenced on March 28, 2012.

E. The Trial Court Erred When Considering the Length and Amount of Pendente Lite Support Paid in Determining the Length of the Limited Duration Alimony.

POINT NINE: THE TRIAL COURT ERRED BY FAILING TO RECALCULATE CHILD SUPPORT BASED UPON DEFENDANT'S IMPUTED INCOME AND TO PROVIDE PLAINTIFF WITH A CREDIT FOR OVERPAYMENT OF CHILD SUPPORT.

POINT TEN: THE TRIAL COURT ERRED BY FAILING TO AWARD PLAINTIFF COUNSEL FEES AND COSTS ASSOCIATED WITH THE PLENARY HEARING.

## II.

With respect to defendant's first point on appeal, we disagree with her contention that plaintiff failed to exercise due diligence. As the trial court correctly concluded, plaintiff's conduct was sufficient to fulfill his due diligence obligation.

We note that due diligence is required when a party brings a motion to reopen a judgment pursuant to Rule 4:50-1(b). While it is true that, unlike subsection (b), such a requirement is not expressly set forth in subsection (f), subsection (f) is grounded in equity, and the court must take into account all relevant circumstances in deciding whether a judgment must be reopened to correct an injustice. See US Bank Nat'l. Ass'n v. Guillaume, 209 N.J. 449, 467 (2012); F.B. v. A.L.G., 176 N.J. 201, 207-08 (2003). Whether the party seeking relief contributed to or inexcusably missed opportunities to avoid the claimed problem with the judgment would be a relevant circumstance. See Badalamenti v. Simpkiss, 422 N.J. Super. 86, 103-04 (App. Div. 2011) (ruling that the plaintiffs were not entitled to relief under Rule 4:50-1(f) because they had not acted with due diligence in pursuing their claim and the defendants would be prejudiced if required to re-litigate the case).

Here, once plaintiff secured the March and May 2011 discovery orders, he was under no obligation, and had no reason, to pursue matters further.  He had a right to expect that defendant would comply with the court's orders.  And, as the court noted, to find otherwise would legitimize defendant's lack of compliance and reward her for her "contumacy" to plaintiff's detriment.  Thus, we conclude that plaintiff exercised due diligence during the divorce trial as to defendant's disability and was not precluded from statutory relief on that issue.

III.

As to the parties' second point, while plaintiff was not precluded from seeking relief pursuant to Rule 4:50-1 for lack of due diligence, we agree with defendant, however, that the lower court erred in reopening the FJOD pursuant to Rule 4:50-1(f).

Motions brought pursuant to Rule 4:50-1 should be granted sparingly. F.B., 176 N.J. at 207.  The decision whether to vacate a judgment is a determination left to the sound discretion of the trial court, guided by principles of equity, and may not be reversed absent an abuse of that discretion.  Ibid.; US Bank Nat'l. Ass'n, 209 N.J. at 467.

Rule 4:50-1 provides in pertinent part that a trial court may relieve a party from a final judgment or order where a showing has been made of, among other

things, "fraud . . . misrepresentation, or other misconduct of an adverse party," or "any other reason justifying relief from the operation of the judgment or order." R. 4:50-1(c) and (f). The need to reopen a judgment must be established by clear and convincing evidence. Pavlicka v. Pavlicka, 84 N.J. Super. 357, 366 (App. Div. 1964). It is not necessary to identify the subsection pursuant to which relief from the judgment is sought. F.B., 176 N.J.at 208. If the relief is sought on contested facts, the court must hold an evidentiary hearing. Nolan by Nolan v. Lee Ho, 120 N.J. 465, 474 (1990). Applications seeking relief under subsection (c) for fraud, misrepresentation or misconduct must be brought within one year of the judgment. F.B., 176 N.J. at 208 (citing R. 4:50-2).

Rule 4:50-1 "was patterned after Fed. R. Civ. P. 60(b), and '[i]t is therefore proper to draw on the experience of the federal courts with that rule . . . .'" Baumann v. Marinaro, 95 N.J. 380, 392 (1984) (quoting Hodgson v. Applegate, 31 N.J. 29, 35 (1959)). In that regard, the United States Court of Appeals for the Third Circuit held in Stridiron v. Stridiron, 698 F.2d 204, 207 (1983), that to prevail on a motion brought pursuant to Rule 60(b)(3), "the movant must establish that the adverse party engaged in fraud or other misconduct, and that this conduct prevented the moving party from fully and fairly presenting his

case."  It further held that a "[f]ailure to . . . produce evidence requested in discovery can constitute Rule 60(b)(3) misconduct."  Ibid.

In order to obtain relief from a final judgment under Rule 60(b)(3) an opposing party or its counsel must have been found to have engaged in the fraud, misrepresentation, or misconduct.  See, e.g., Metlyn Realty Corp. v. Esmark, Inc., 763 F.2d 826, 832 (7th Cir. 1985) (affirming the District Court's denial of relief pursuant to Rule 60(b)(3) when neither the party nor its counsel knew that their expert witness' statements were false); L.I. Head Start Child Dev. Servs., Inc. v. Economic Opportunity Commission of Nassau County Inc., 956 F. Supp. 2d 402, 410 (E.D.N.Y. 2013) ("[T]he movant must show . . . that the fraud is attributable to the party, or at least, to counsel."  (Internal quotation marks omitted)); Abrahamsen v. Trans-State Exp., Inc., 92 F.3d 425, 427-28 (6th Cir. 1996) (vacating a judgment pursuant to Rule 60(b)(3) when the plaintiff's counsel requested certain statements to be produced and none were produced by the defendant's counsel, and the defendant's counsel further allowed the defendant to testify at trial that he never made any such statement).

Federal courts have also held that misconduct under Rule 60(b)(3) does not require proof of malicious intent or purpose in order to entitle a party to relief.  Anderson v. Cryovac, 862 F.2d 910, 923 (1st Cir. 1988); Londsorf v.

Seefeldt, 47 F.3d 893, 897 (7th Cir. 1995). Indeed, in order for the term "misconduct" to have meaning, it must differ from fraud and misrepresentation. Anderson, 862 F.2d at 923. Under this expansive view of misconduct, even accidental omissions qualify and "relief on the ground of misconduct may be justified 'whether there was evil, innocent[,] or careless, purpose.'" Ibid. (quoting Bros. Inc. v. W.E. Grace Manufacturing Co., 351 F.2d 208, 211 (5th Cir.1965)).

Rule 4:50-1(f) is a "catch-all" provision incapable of categorization. DEG, LLC v. Twp. of Fairfield, 198 N.J. 242, 269-70 (2009). It allows for relief in "exceptional situations" where hardship has been shown and, as such, its "boundaries are as expansive as the need to achieve equity and justice." Id. at 270 (quoting Court Inv. Co., v. Perillo, 48 N.J. 334, 341 (1966)). It is well settled, however, that the reason specified cannot fall under any of the subsections subject to the one-year limitation. Ibid.; accord Manning Engineering, Inc. v. Hudson County Park Comm'n., 74 N.J. 113, 121-23 (1977).

Here, defendant and her counsel's discovery violations constituted "other misconduct" for purposes of Rule 4:50-1(c). In this regard, the trial court itself characterized defendant and her counsel's conduct in failing to produce documents as "contumac[ious]," which refers to "[c]ontempt of court [or] the

refusal of a person to follow a court's order or direction[,]" Black's Law Dictionary (11th ed. 2019), a conclusion fully supported by the record and the court's other findings. Indeed, the court found that plaintiff was not in possession of all relevant and necessary facts regarding defendant's disability because she failed to provide critical discovery that was in her possession, in violation of a court order and which prevented plaintiff from a full and fair trial.

That misconduct would justify relief regardless of "'whether there was evil, innocent[,] or careless, purpose.'" See Anderson, 862 F.2d at 923 (quoting Bros. Inc., 351 F.2d at 211). And, even if such conduct were attributable to her counsel, those actions would still constitute "other misconduct" as plaintiff only needed to demonstrate that the misconduct was "attributable to the party, or at least, to counsel." See L.I. Head Start Child Dev. Servs., Inc., 956 F. Supp. 2d at 410; see also Metlyn Realty Corp., 763 F.2d at 832; Abrahamsen, 92 F.3d at 427-28. Consequently, plaintiff's motion under Rule 4:50-1(c) was out of time and it was, therefore, improper for the trial court to rely upon Rule 4:50-1(f).

Moreover, plaintiff cannot avoid the one-year limitation by claiming fraud on the court. Fraud on the court requires grossly egregious misconduct, or an unconscionable plan or scheme, designed to improperly influence the court. Herring v. U.S., 424 F.3d 384, 386-87 (3d Cir. 2005); Rozier v. Ford Motor Co.,

38

573 F.2d 1332, 1338 (1978).  Less egregious misconduct, such as nondisclosure of pertinent facts, does not qualify as fraud on the court.  Ibid.

Finally, we acknowledge that when the court determined that limited durational alimony was appropriate, it evaluated the statutory factors set forth in the revised alimony statute.  We are, nevertheless, unable to determine to what extent the revised statute's limitation on total duration of alimony for marriages less than twenty years affected the trial court's decision in its alimony award.  Further, the court noted that it "ordered a new determination of alimony, not on the basis of changed circumstances, but in the interest of justice."

Thus, we reverse and remand for reconsideration the court's August 4, 2017 order for a reevaluation of plaintiff's claim using the changed circumstances standard contemplated by the 2012 FJOD.  The purpose of our remand is to permit the trial court in the first instance to assess and apply the facts already found which we have concluded are supported by substantial credible evidence, see page 49 infra, or conduct additional proceedings as the court deems appropriate, and issue supplemental findings and conclusions on the issue of whether plaintiff is entitled to a modification or termination of alimony as a result of changed circumstances and consistent with the earlier iteration of the alimony statute.

A-5884-17T1

IV.

Although we have decided to reverse the court's August 4, 2017 order, we address the remaining issues raised by the parties as they affect our decision and the remanded proceedings.

With respect to defendant's third, fourth, and fifth points on appeal, defendant contends that the trial court committed various evidentiary errors by: 1) admitting into evidence portions of the 2016 surveillance videotape without a proper foundation and a chart prepared by plaintiff's counsel identifying by time stamp where each snippet of the videotape could be located; 2) relying upon Dr. Behar's opinion as to defendant's condition because it was premised entirely on the surveillance videotapes; and 3) refusing to admit medical records containing the various diagnoses discussed by Dr. Behar. We disagree.

A trial court's evidentiary rulings are entitled to deference and will not be disturbed absent an abuse of discretion. Belmont Condo. Ass'n, Inc. v. Geibel, 432 N.J. Super. 52, 95-96 (App. Div. 2013). Accordingly, we will uphold the trial court's evidentiary rulings "unless it can be shown that the trial court palpably abused its discretion, that is, that its finding was so wide off the mark that a manifest denial of justice resulted." Ibid. (quoting Green v. N.J. Mfrs.

<u>Ins. Co.</u>, 160 N.J. 480, 492 (1999)).  Here, the trial court did not abuse its discretion.

With respect to the surveillance tapes, before the two investigators took the stand, plaintiff's counsel sought to expedite the trial by playing only the particular snippets of the four hours of videotape that he wished to emphasize. After the investigators had finished testifying, the trial court shared its thoughts about the videotape:

> So, let's talk about the videos real quick, what we're going to do with them.  At the minimum, I find that there has been, established by the plaintiff, that the portions played in court have been authenticated.  So, if you want to move those in we can move only what you showed into evidence.  The . . . problem, though, is conveying that to the Appellate Division in case it goes up there, in terms of the . . . time stamps at the bottom, what . . . it is exactly we played.

In response, plaintiff's counsel advised the court that it had a chart setting forth the location of each portion of the video that was played by time stamp with an accompanying brief description.  While acknowledging the practicality of the chart, defense counsel objected to its admission, noting that he had not had the opportunity to verify its accuracy.  The court admitted the chart, over defense counsel's objection, solely to aid appellate review and because it was used by plaintiff's counsel simply to assist in locating those portions of the tape

41

he wanted to show the court. The court's evidentiary ruling clearly did not abuse its discretion and defendant has not established how she was prejudiced by the court's consideration of the tapes and chart in any event.

We similarly reject defendant's challenge to Dr. Behar's testimony. Notably, defendant never objected to the admissibility of Dr. Behar's opinion. Contrary to defendant's claims on appeal, Dr. Behar did not limit the bases of his opinion to a review of the videotape, but instead stated that he conducted "a full review of the medical records, objective tests, an office examination of defendant and the video surveillance of defendant." Moreover, Dr. Behar specifically identified those portions of the videotapes upon which he relied in rejecting Dr. Kramer's diagnosis of PPD (i.e., the swim meet, shopping in beauty store, spraying for insects), all of which were admitted below without objection from defendant.

Likewise, we reject defendant's challenge to the court's refusal to admit the medical records that contained the various diagnoses discussed by Dr. Behar. First, the defense was fully aware, prior to trial, that they would have to produce the treating physicians as witnesses before any records and opinions would be admissible at trial. This is particularly significant here as those records contained complex medical diagnoses and were inadmissible hearsay. See

N.J.R.E. 803(c)(6), 808.  Further, Dr. Behar could not authenticate the medical records.  Finally, defendant has not established any prejudice from the exclusion of these records, many of which counsel conceded were already in evidence.

V.

As to defendant's seventh point, defendant maintains that the trial court erred in applying the 2014 amendments to the alimony statute because the marriage, divorce proceedings, lifestyle determination and FJOD preceded the September 2014 amendments, and the 2012 FJOD provided that alimony could be reviewed under the change in circumstances standard upon the conclusion of the Hartford litigation.  As previously noted, we agree.

In September 2014, the Legislature amended the alimony and maintenance statute, N.J.S.A. 2A:34-23, "to more clearly quantify considerations examined when faced with a request to establish or modify alimony."  Spangenberg v. Kolakowski, 442 N.J. Super. 529, 536-37 (App. Div. 2015).  In particular, the amended statute provided that "[f]or any marriage . . . less than [twenty] years in duration, the total duration of alimony shall not, except in exceptional circumstances, exceed the length of the marriage."  N.J.S.A. 2A:34-23(c).  The bill adopting the alimony amendments indicated that they were to take effect immediately and further provided, in pertinent part, that they "shall not be

construed . . . to modify the duration of alimony ordered" in a "final judgment of divorce." Spangenberg, 442 N.J. at 538 (quoting L. 2014, c. 42, §2). This language "signal[ed] the legislative recognition of the need to uphold prior agreements executed or final orders filed before adoption of the statutory amendments." Ibid.

In its opinion, the trial court "vacated the portion of the [FJOD] that required plaintiff to pay defendant alimony" and stated that "[b]ecause there continues to be no final judgment of divorce that sets a duration of alimony, and because it is 2018, four years after the effective date of the amendment to the alimony statute, the 2014 amendments apply to this case." As noted, however, we conclude that the court improperly determined that defendant's conduct fell outside of Rule 4:50-1(c) and should have evaluated the merits of plaintiff's claim under the changed circumstances standard contemplated by the 2012 FJOD and the earlier version of the alimony statute.

## VI.

Defendant also contends in her eighth point that the court erred in emancipating Luke prior to his high school graduation and when his college plans had not yet been set. We agree that based on the motion record, the court should not have emancipated Luke.

44

When a child has reached the age of eighteen, he or she is presumed to be emancipated, N.J.S.A. 9:17B-3, but the presumption is not conclusive. Newburgh v. Arrigo, 88 N.J. 529, 543 (1982); Llewelyn v. Shewchuk, 440 N.J. Super. 207, 216 (App. Div. 2015). A party seeking to have parental support continue can overcome this statutory presumption by submitting evidence that the child has not moved "beyond the sphere of influence and responsibility exercised by a parent and obtain[ed] an independent status of his . . . own." Filippone v. Lee, 304 N.J. Super. 301, 308 (App. Div. 1997) (quoting Bishop v. Bishop, 287 N.J. Super. 593, 598 (Ch. Div. 1995)). This fact-sensitive evaluation must include consideration of issues such as the "child's need, interests, and independent resources, the family's reasonable expectations, and the parties' financial ability, among other things." Dolce v. Dolce, 383 N.J. Super. 11, 18 (App. Div. 2006). In particular, a child's "enrollment in a full-time educational program has been held to require continued support." Patetta v. Patetta, 358 N.J. Super. 90, 94 (App. Div. 2003).

In its July 18, 2018, decision, the trial court found that Luke was "eighteen years old, has graduated from high school, and there is no evidence that he is enrolled in college or trade school" and that since "the only evidence is that both children have graduated from high school[,] . . . the court finds no child support

should be awarded." During her trial testimony, however, defendant stated that Luke, who had turned eighteen three and one-half months earlier, would be graduating high school in two months, lived with her and had no plans of moving out, had been accepted at nine colleges and received some scholarship monies, and planned on attending, but had not yet decided what to do in part for financial reasons. Luke did not testify.

The record reflects that while defendant never definitively stated that Luke was going to college, she offered unrebutted testimony indicating that Luke's goal was to attend college and that he had taken substantial steps toward that end. Luke had submitted applications to, and been accepted by, numerous colleges, and had been awarded scholarship monies. Given this testimony and the fact that Luke had two months of high school remaining and was still living in defendant's home at the time of her testimony, the trial court prematurely declared Luke emancipated.

## VII.

In support of his cross-appeal, plaintiff maintains that the court, having vacated the FJOD, erred in refusing to recalculate child support as of 2012 utilizing the income the court imputed to plaintiff. He accordingly seeks reimbursement for the alleged overpayments from 2012 through the July 18,

2018 order. As explained in section III, we are reversing that portion of the August 4, 2017 order granting plaintiff's motion to reopen the 2012 judgment, and plaintiff's argument therefore lacks its foundational premise. Instead, plaintiff must rely upon changed circumstances for any modification to his child support obligation, an alternative form of relief sought in his July 7, 2016 motion. Such an application, however, is limited by N.J.S.A. 2A:17-56.23a which provides that "[n]o payment or installment of an order for child support . . . shall be retroactively modified by the court except with respect to the period during which there is a pending application modification, but only from the date the notice of motion was mailed either directly or through the appropriate agent."

Thus, plaintiff is precluded from any modification before July 7, 2016. Further, as noted, the court emancipated Luke in its July 18, 2018 order, a ruling we have also reversed. Accordingly, on remand, plaintiff may renew his application to modify his child support obligation, effective July 7, 2016. Any such application must also address the fact that Luke was improperly emancipated as well as the period between September 11, 2017 and July 18, 2018 which represents the time between the September 11, 2017 consent order emancipating Collin and the court's July 18, 2018 order. We do not address

circumstances regarding Luke's emancipation subsequent to the court's ruling as those facts are not before us.

## VIII.

Concerning the parties' challenges to the court's denial of their requests for counsel fees, we find no abuse of discretion by the trial court in reaching its decision. The court set forth the appropriate analysis in denying the parties' fee requests. See R. 5:3-5(c); R. 4:42-9; N.J.S.A. 2A:34-23. We will disturb a trial judge's award of counsel fees only in the rarest of circumstances and only for a "clear abuse of discretion." Strahan v. Strahan, 402 N.J. Super. 298, 317 (App. Div. 2008). We discern no abuse of discretion in the court's decision. We leave it to the court's discretion to determine if fees are recoverable based on the remanded proceedings.

## IX.

Because we are reversing the court's August 4, 2017 order and remanding for further proceedings, we do not address specifically whether the court correctly awarded $450 per week in limited duration alimony and the term of that award, including its commencement date, as contended by plaintiff in points eight, and eight, D and E. For purposes of the remanded proceedings, we have, however, considered defendant's arguments asserted in points eight, A., 1-2, B.-

C., and determine that except as addressed in this opinion, the court's related factual findings contained in its July 18, 2018 written opinion are supported by substantial credible evidence, see Cesare v. Cesare, 154 N.J. 394, 411–12 (1998), and reject any challenge to those findings as lacking sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E). As noted, however, we conclude that the court in the first instance should apply those facts to the correct changed circumstance standard memorialized in the parties FJOD and the applicable alimony statute.

Affirmed in part and reversed and remanded in part. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION